# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MELODY CUNNINGHAM, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>LYFT, INC. and LOGAN GREEN,<br><br>    Defendants. | Case No. 1:19-cv-11974 |

## PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

### I.    INTRODUCTION

Plaintiff brings this motion to seek a preliminary injunction against Defendants, Lyft, Inc. ("Lyft") and Logan Green, for misclassifying Lyft drivers throughout Massachusetts as independent contractors when they should be classified as employees under Massachusetts Law, in violation of Mass. Gen. L. c. 149 § 148B.  As a result of this misclassification, Lyft has forced its drivers to pay to work, in the form of paying their own business expenses (including but not limited to the cost of maintaining their vehicles, gas, insurance, phone and data expense, and other costs) in violation of Mass. Gen. L. c. 149 §§ 148, 150.  Lyft has also failed to guarantee that its drivers receive minimum wage for their work hours, in violation of Massachusetts Minimum Wage Law, Mass. Gen. L. c. 151 § 1, and Lyft has failed to pay overtime premium for hours worked in excess of forty hours per week, in violation of the Massachusetts Overtime law, Mass. Gen. L. c. 151 § 1A.  See Compl. Dkt-1 at p. 1.

Lyft drivers are harmed by these violations, as drivers struggle to earn a living wage due

to the burden of paying necessary business expenses and the loss of workplace and wage protections under Lyft's misclassification scheme.  Lyft has furthermore exacted an irreparable harm on the Commonwealth of Massachusetts by diminishing labor standards, depriving the state of tax revenue, and costing the state and taxpayers money in public assistance that is needed for Lyft drivers who cannot meet their basic needs due to their being deprived of their rights under the Massachusetts wage laws.  Lyft's practice of misclassifying its drivers as independent contractors also unfairly disadvantages other transportation companies who classify drivers as employees in compliance with Massachusetts state law.  These harms cannot be adequately remedied later, if years of litigation must ensue before a court issues a ruling on the legality of Lyft's classification of its drivers as independent contractors.

Accordingly, Plaintiff seeks a preliminary injunction to enjoin Lyft from misclassifying its drivers as independent contractors, in order to prevent irreparable harm.  As outlined below, Plaintiff is able to establish the four factors the Court must evaluate in granting a preliminary injunction: (1) Plaintiff is likely to succeed on the merits of his claims; (2) Plaintiff (as well as the Massachusetts public) will suffer irreparable injury in absence of a preliminary injunction; (3) such injury outweighs any harm to the Lyft, a huge corporation; and, (4) the injunction will not harm public interest (but is rather in the public interest). See Lanier Prof'l Serv., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).

**First**, Plaintiff can establish a likelihood of success on the merits.  Massachusetts follows an extremely stringent test, known as the "ABC" test, for determining whether a worker is an employee.  Under Massachusetts law, an individual who performs services in the "usual course of business" is an employee as a matter of law. See Mass. Gen. L. c. 149 § 148B(a)(2); Somers v. Converged Access, Inc., 454 Mass. 582, 590-91 (2009) (alleged employer must prove all three prongs of the three-part test of § 148B in order for individual to be properly classified as an

PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR INJUNCTIVE RELIEF

independent contractor).  California recently followed Massachusetts' lead in adopting this strict

"ABC test," <u>Dynamex Operations W., Inc. v. Superior Court</u>, 4 Cal.5th 903, 956–57 (2018), in

large part to contend with the endemic of misclassification in the "gig economy," typified by

Lyft.  Indeed, the week before last the California legislature passed Assembly Bill No. 5 ("A.B.

5"), in order to codify <u>Dynamex</u>'s adoption of the Massachusetts "ABC test," which has been

widely understood by both the public and the legislators who drafted the bill in California to be

aimed at stopping Lyft's (and other "gig economy" companies') misclassification of their drivers

as independent contractors, in the face of the increasing crisis this misclassification is causing to

labor standards.[1]  The bill has even been dubbed the "gig labor bill" and described as "dealing a

potential body blow to gig economy players, **like** Uber and **Lyft**."[2]

If Lyft attempts to argue that it can satisfy the B prong of the ABC test (under either

Massachusetts, or now California, law), that argument would not pass the straight-face test.  This

fact is made even more clear by the events unfolding now in California – where the legislature

specifically adopted and codified the Massachusetts ABC test in order to force the

reclassification of Lyft (and other gig economy) drivers as employees.[3]  In a clear effort to

simply buy more time by dragging out these arguments in court,[4] Lyft may argue that its drivers

---

[1]    <u>See</u>, <u>e.g.</u>, Kate Conger and Noam Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. TIMES, Sept. 11, 2019 ("California legislators approved a landmark bill on Tuesday that requires **companies like** Uber and **Lyft** to treat contract workers as employees") (emphasis supplied); Liam Nelson, *Sweeping Bill On Independent Contractors Passes California State Senate*, L.A. TIMES (describing pushback on the bill from "most notably Uber, **Lyft**, Postmates and Doordash") (emphasis supplied); George Skelton, *Labor won big with bill to rewrite California employment law – but it's flawed*, L.A. TIMES ("**most of the public's attention concerning the bill has focused on** Uber and **Lyft** drivers").

[2]    Cheryl Miller, *Newsom Signs Landmark Gig Labor Bill, as Court Cases Loom*, THE RECORDER, Sept. 18, 2019; *Calif. Gov. Signs Worker Misclassification Bill Into Law*, LAW360, Sept. 18, 2019.

[3]    Plaintiff's counsel has also filed a motion for preliminary injunction in the in the pending Lyft misclassification suit they have filed in California. <u>Seifu, et al. v. Lyft, Inc.</u>, Superior Court, County of Los Angeles, Case No. BC712959 (filed July 5, 2018).

[4]    Plaintiff's counsel previously litigated misclassification claims against Lyft in Massachusetts and California, litigation that dragged on for years, mired in disputes over the

do not provide a service within its usual course of business.  Such an argument clearly fails.  Lyft

is a transportation company, and Lyft depends upon its drivers to sustain and carry out its

transportation business.  See Cotter v. Lyft, 60 F.Supp.3d 1067, 1069 (N.D. Cal. 2015)  ("[T]he

argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a

serious one");  see also O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1144 (N.D. Cal.

2015) ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is

not in the transportation business.").  There can really be no doubt that drivers perform services

in Lyft's "usual course of business," and thus that Lyft is the drivers' employer as a matter of

law under Massachusetts law, Mass. Gen. L. c. 149 § 148B.

Lyft will, at last, be required to resolve this claim on its merits, rather than divert the

claims to arbitration.  Here, Plaintiff has new arguments that this claim will not be subject to

arbitration, arguments that were not at issue in the Wickberg/Bekele actions,[5] and which will

compel that the issue of Lyft's misclassification of its drivers be decided now, at the outset of the

case, rather than **years** in the future.  Pushing resolution years into the future will cause **years** of

further irreparable damage to Lyft drivers, who are sleeping in their cars to survive; the

Commonwealth of Massachusetts and its residents and taxpayers, who are losing millions, if not

---

enforceability of Lyft's arbitration clause. See Cotter v. Lyft, Inc., N.D. Cal. 3:13-cv-04065-VC; Bekele v. Lyft, Inc., D. Mass, C.A. 1:15-cv-11650.

[5]     Plaintiff has two arguments to avoid arbitration here. First, Plaintiff is seeking a public injunction, as it would benefit not only herself and other Lyft drivers, but also the public at large. The California Supreme Court has declared that a claim seeking a public injunction cannot be prevented by virtue of an arbitration clause, see McGill v. Citibank, N.A., 2. Cal. 5th 945, 962 (2017), and Plaintiff submits that the Massachusetts Supreme Judicial Court would follow suit on this issue, as discussed infra at p. 15 & n. 16.

Plaintiff also now has an argument, based on a decision issued recently by the Third Circuit, that Lyft drivers are exempt from the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, as they fall within the transportation worker exemption to the Act.  See Singh v. Uber Techs., 2019 WL 4282185 ((3rd Cir., Sept. 11, 2019) (§ 1 transportation exemption applies to workers who transport passengers, as well as goods); see also Waithaka v. Amazon, 2019 WL 3938053, at *2–4 (D. Mass., Aug. 20, 2019) (Amazon delivery drivers fall under the § 1 transportation worker exemption, as they transport some goods that travel across state lines, even though the drivers themselves do not cross state lines).

PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR INJUNCTIVE RELIEF

billions; and the transportation industry and economy as a whole, which are being degraded by

Lyft's disregard for Massachusetts wage and hour laws.

As suggested above, on the **second** element for preliminary injunction, Plaintiff will

easily be able to establish that Plaintiff (and the public) will suffer irreparable harm should an

injunction not issue.  As the California legislature aptly put it in its preamble to A.B. 5, "The

misclassification of workers as independent contractors has been a significant factor in the

erosion of the middle class and the rise in income inequality." 2019 California Assembly Bill

No. 5, California 2019-2020 Regular Session, ("A.B. 5").  The passage of that bill makes clear:

California has specifically chosen to adopt the Massachusetts "ABC test" in response to the crisis

of Lyft and the "gig" economy's misclassification model, which costs California $7 billion

annually in taxes, [6] and costs Massachusetts millions, if not billions, in payroll taxes, as well as

funds that taxpayers are paying to provide public benefits to Lyft drivers who (in the absence of

wage protections) struggle to afford basic necessities.[7]

**Third**, the injury that Plaintiff (and the public) would suffer in the absence of an

injunction (a cost to the Commonwealth of millions, if not billions) outweighs any potential

---

[6]     AB 5 is widely seen as a legislative enactment of the Massachusetts ABC test to apply to
the gig economy. See, e.g., Steven Yoder, *Will Assembly Bill 5 Destroy the Gig Economy*,
COMSTOCK'S MAGAZINE, Aug. 22, 2019. The bill's drafter, Lorena Gonzalez, introduced the bill
in response to Lyft's misclassification of its drivers as independent contractors, which allows
Lyft (and other "gig" economy companies) to "rely on a contract workforce, which enables them
to skirt labor laws, exploit working people and leave taxpayers holding the bag." Lorena
Gonzalez, *The Gig Economy Has Costs. We Can No Longer Ignore Them.*, Wash. Post, Sept. 11,
2019. **This misclassification costs California $7 billion annually in lost tax revenue**. Id.
        Despite the bill being directly designed to address Lyft's misclassification scheme, Lyft
(and Uber) aggressively lobbied for an exemption, which the California legislature refused to
grant them. Alicia Fernández Campbell, *Uber and Lyft Just Lost Another Battle in California*,
Vix, Aug. 30, 2019.

[7]     The studies were published in 2004 and 2014. Brief for the National Labor Relations
Board as Amicus Curiae in Support of General Counsel's Request to Affirm the Administrative
Law Judge's Decision at 11 & n. 27, Velox Express v. Jeannie Edge, Case 15-CA-184006.
Presumably, with the increase in the gig economy presence in Massachusetts, these losses have
only increased in the years since. See Adam Vaccaro and Allison Hagan, *Uber, Lyft Use
Skyrocketing in Massachusetts*, Boston Globe, June 13, 2019 (reporting a 25% increase in Uber
and Lyft rides in Massachusetts between 2017 and 2018, and a total of 81.3 million rides in
2018).

harm to Lyft.  This fact is underlined by Lyft's response to persistent calls for it to reclassify its

drivers: no, it will not classify the drivers as employees.  Lyft has simply ignored the laws of the

Commonwealth and has continued to carry on business using a misclassification model because

it is a large enough company that it can afford to litigate and drag out the claims (and campaign

against the law in California), rather than comply with the law.  Lyft has even publicly declared

that it will commit $30 million to a ballot initiative to repeal A.B. 5; as California

Assemblywoman Lorena Gonzalez, the author of A.B. 5, commented, "If they have millions of

dollars to put into a ballot initiative, why don't they pay their workers more?"[8]

Finally, **fourth,** it is not in the public interest to allow Lyft to continue to misclassify its

drivers and inflict public harm on the Commonwealth and its residents, while using litigation

tactics to stall resolution and enforcement of § 148B.  Plaintiff and the public cannot wait

another four years for Lyft to comply with Massachusetts wage laws.  In the interim, the harm

that misclassification will inflict on Plaintiff and other Lyft drivers – and the Commonwealth, its

businesses, its taxpayers, and residents – is too great to bear and simply cannot be remedied later.

As illustrated by the years of litigation, the pitched public debate regarding A.B. 5 in

California, and Lyft's continued obstinance in the face of clear law discussed here – this case is

no usual case.  The current version of the "ABC test" has been the law in Massachusetts since

2004.  See 2004 Mass. Legis. Serv. Ch. 193 (S.B. 2358) (WEST) (approved July 19, 2004).  Lyft

clearly cannot satisfy the "ABC test" and thus Lyft cannot justify classifying its drivers as

independent contractors.[9]  This conclusion is only bolstered by the developments that have

---

[8]    Jeremy B. White, *Uber, Lyft pitch landmark California worker proposal – and tech industry's first ballot threat*, Politico, Aug. 29, 2019.  California's Governor, Gavin Newsom, signed the bill into law just last week, on September 18, 2019, giving the bill an effective date of January 2020. Conger, supra n. 1; Miller, supra note 2.

[9]    Plaintiff does not believe that Lyft can satisfy **any** of the three prongs, but there is no question that Lyft cannot satisfy Prong B and that, alone, is enough to establish that Lyft has misclassified its drivers as independent contractors.

recently unfolded in California with the passage of A.B. 5.

For the foregoing reasons, and as outlined below, this Court should issue a preliminary injunction enjoining Lyft from continuing to misclassify its drivers and ordering that Lyft classify its drivers as employees so as to prevent irreparable harm to Lyft drivers and the public. The Commonwealth cannot afford to wait for another lengthy battle to bring Lyft into compliance with a § 148B – a statute that pre-dates Lyft's arrival in Massachusetts and is vital in protecting Massachusetts and its residents from the growing threat of misclassification and concomitant erosion of labor violations in the Commonwealth.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2019, Plaintiff filed this class action complaint alleging that Lyft has misclassified its drivers as independent contractors, when the reality of the situation is that they are employees of Lyft and therefore entitled to employment protections under Massachusetts state law. See Compl. Dkt-1, at ¶2.[10]

Plaintiff is an adult resident of Weymouth, Massachusetts, where she has been driving for Lyft since June 2013. Complaint ¶4.  Lyft has misclassified Plaintiff, and other Lyft drivers throughout Massachusetts, as independent contractors. Complaint ¶13.  As a result of this misclassification, Plaintiff and other Lyft drivers have suffered a variety of Massachusetts wage law violations, most notably having to pay to work, including for their own vehicle expenses, gas, insurance, and phone and data expenses for running the Lyft Application. See Awuah v. Coverall, 460 Mass. 484, 498–99 (2011) (Massachusetts wage law makes it illegal for employee to have to pay for a job, including expenses necessary to perform the job, such as insurance); see also Camara v. Attorney Gen., 458 Mass. 756, 763 n. 11 (2011) (a policy that "shifts to the …

---

[10]      The complaint also names Lyft's co-founder and CEO, Logan Green, as a defendant. Under Mass. Gen. L. c. 149, §§ 148, 150, the president of a defendant company is liable for the violations alleged here.

employees some of what appear to be the ordinary costs of doing business" violates the Wage

Act); Massachusetts Delivery Ass'n v. Healey, 2015 WL 4111413, *6 (D. Mass. July 8, 2015)

(noting that liability under § 148B would require courier company "to supply company vehicles

to its couriers who currently use their own vehicles for deliveries, . . . [or] [a]lternatively, …[to]

forego investment in delivery vehicles and instead reimburse courier-employees for the miles

they drive in their own cars"); Martins v. 3PD, Inc., 2014 WL 1271761, *7-10 (D. Mass. Mar.

27, 2014) (delivery company violated § 148 by requiring delivery drivers – who were

adjudicated to be employees under Mass. Gen. L. c. 149 § 148B – to bear expenses, such as lease

payments, administrative fees, uniforms, chargebacks for physical damage caused during the

delivery process, and various forms of insurance including liability insurance, vehicle insurance,

and workers' compensation insurance).  In addition, Lyft has failed to ensure that its drivers

receive minimum wage or are paid overtime for hours worked passed 40 per week, in violation

of the Massachusetts Minimum Wage Law, Mass. Gen. L. c. 151 § 1, and the Massachusetts

Overtime law, Mass. Gen. L. c. 151 § 1A. See Compl. Dkt-1, at ¶26–27.

Massachusetts follows a stringent "ABC test," under Mass. Gen. L. c. 149 § 148B,

which, until the California Dynamex decision last year, was the strictest law in the country

prohibiting independent contractor misclassification.  This test contains three conjunctive prongs,

all of which an alleged employer must satisfy in order to justify classifying a worker as an

independent contractor. See Somers., 454 Mass. at 590-91; Depianti v. Jan-Pro Franchising

Intern., Inc., 465 Mass. 607, 621 (2013) ("[T]he statute lays out three indicia of an independent

contractor relationship, all three of which must be established to rebut the presumption of

employment.").

The B prong requires an alleged employer to prove that the worker performs services

outside its usual course of business.  Lyft will simply not be able to satisfy Prong B of this test.

Lyft drivers provide transportation services, and Lyft is a transportation company.  Although Lyft may claim that it is not a transportation company, but is instead a mere "platform", this argument does not pass the straight-face test and has already been rejected in federal court. See Cotter, 60 F.Supp.3d at 1069 ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one"); id. at 1069 ([Lyft drivers] work is central, not tangential, to Lyft's business"); see also O'Connor, 82 F. Supp. 3d at 1144 ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business.").  In a resounding 82-page unanimous decision, the California Supreme Court specifically chose to adopt Massachusetts's "ABC" test in Dynamex, 4 Cal.5th 903, in order to protect the public and create a clear line which would prohibit employers like Lyft from continuing to misclassify their workers, when their workers provide the employer's core service.[11]  Because employers, particularly those in the "gig economy" continued their scheme of misclassifying their workers as independent contractors, even after the Supreme Court's ruling in Dynamex, the California state legislature passed a bill (just the week before last) to codify Dynamex and solidify the adoption of the Massachusetts "ABC" test.[12]  It is widely recognized in California that the purpose of the bill is to require that employers – notably Uber and Lyft and the rest of the "gig economy" – reclassify their workers as employees. See discussion supra at p. 5 note 6.  As the bill's author, Assemblywoman Lorena Gonzalez, stated, the bill's message is

---

[11]     California previously used a multi-factor test under S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 48 Cal.3d 341 (1989), but, as the California Supreme Court noted in Dynamex, the Borello multi-factor test was prone to ambiguity and had become unworkable. 4. Cal.5[th] at 948.  The Court adopted the "ABC test," in part, because the test is a "simpler, more structured test for distinguishing between employees and independent contractors." Id. at 955.

[12]     "This bill would state the intent of the Legislature to codify the decision in the Dynamex case and clarify its application." 2019 California Assembly Bill No. 5, California 2019-2020 Regular Session.

that the state legislature "will not in good conscience allow free-riding businesses to profit off depriving millions of workers from basic employee rights that lead to middle-class job." [13]

Meanwhile, in Massachusetts, Mass. Gen. L. c. 149 § 148B has been the law setting the standard for misclassification, in its current form, since 2004.  The Massachusetts Supreme Judicial Court has repeatedly made clear the strength of this law and the importance to the Commonwealth of ensuring proper employee classification.  As the SJC articulated in Somers, "[a] legislative purpose behind the independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." 454 Mass. at 592.  The Court explained that to avoid an end run-around, the statute was one of strict liability: "Were employers who violated the statute permitted a 'safe harbor' that allowed them to demonstrate that they would have paid the employee less had they known he or she was not an independent contractor, there would be no financial incentive to ensure employer compliance, and employees would be left with no meaningful protection from misclassification." Id. at 591–92.  Similarly, in Depianti, 465 Mass. 607, 620, the SJC reinforced its declaration of the importance of the independent contractor statute.  The Court noted that the statute, which should be liberally construed, is designed "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Id. at 620 (quoting Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 198 (2013)).  The SJC has also repeatedly declared the importance of not allowing end-runs around the Massachusetts wage laws. Depianti, 465 Mass. at 623 ("To allow such an 'end run' around G.L. c. 149, § 148, would contravene the

---

[13]     Miller, supra note 8. The California state legislature passed the 2019 California Assembly Bill No. 5 ("AB 5") on September 11, 2019, which aimed at Lyft's misclassification policy. See discussion infra p. 2 at note 1; Kate Conger and Noam Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. Times, Sept. 11, 2019.

PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR INJUNCTIVE RELIEF

express purpose of the statute and would nullify the provision therein that specifically forbids this type of special arrangement[.]"); DiFiore v. American Airlines, Inc., 454 Mass 486, 496 (2009) (emphasizing that Court would not countenance an "end run" around the Wage Act).

Despite the clear mandate of Mass. Gen. L. c. 149 § 148B and SJC decisions emphasizing the force of the statute, Lyft has engaged in an end-run around the statute for the entirety of its existence in Massachusetts.  Lyft continued its misclassification scheme, despite legal challenges to it, see Wickberg v. Lyft, Inc., D. Mass, C.A. 18-12095, Bekele v. Lyft, Inc., D. Mass, C.A. 1:15-cv-11650, by deploying its arbitration clause and dragging these cases through years of litigation around the enforceability of the clause and avoiding a legal ruling on the proper classification of Lyft drivers under Massachusetts law.  California is now attempting to force Lyft to reclassify their drivers as employees, by passing A.B. 5, but the "ABC test" underlying A.B. 5 has been the law in Massachusetts for 15 years, pre-dating Lyft, which begs the question: why are Lyft drivers still classified as independent contractors in Massachusetts?

Absent prompt court intervention, Lyft will continue to violate its drivers' basic rights, diminish labor standards, and put the onus on the Commonwealth of Massachusetts to provide a financial safety net for its drivers – thus effectively subsidizing Lyft's continued misclassification of its drivers – despite public acknowledgments and admonitions that its doing so constitutes a public harm.  Plaintiff, on behalf of herself, other Lyft drivers throughout Massachusetts, as well as competing companies who are attempting to comply with the law, and the Commonwealth of Massachusetts and its taxpayers, will suffer irreparable harm in the absence of a preliminary injunction while enduring several (more) years of litigation.  This Court should therefore grant preliminary injunctive relief and enjoin Lyft from classifying its drivers in Massachusetts as "independent contractors" and order Lyft to classify its drivers as employees and comply with Massachusetts wage laws.

### III.   LEGAL ARGUMENT

#### A.   The Court Should Grant Plaintiff's Motion for a Preliminary Injunction

##### i.   Standard of Review

This Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a) and (b).  In order to prevail on a motion for a preliminary injunction, Plaintiff must establish (1) likelihood of success on merits; (2) that plaintiff will suffer irreparable injury in absence of a preliminary injunction; (3) that such injury outweighs any harm to the defendants; and, (4) that the injunction will not harm public interest. Ricci, 192 F.3d at 3 (1st Cir. 1999).  "A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F. F.3d 151, 163 (1st Cir. 2004).  As set forth below, Plaintiff meets all these requirements and has demonstrated that a "potent weapon" is necessary in this case, due to Lyft's continued refusal to properly classify its drivers as employees, in compliance with the "ABC test" of Mass. Gen. L. c. 149 § 148B.

##### ii.   Plaintiff Has Shown Likelihood of Success on the Merits

"[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991).  Notably, when "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." E.E.O.C. v. Astra U.S.A., Inc., 94 F.3d. 738, 743–44 (1st Cir. 1996).

Under the "ABC" test, workers are presumed to be employees. See Mass. Gen. L. c. 149 § 148B.  The putative employer bears the burden of proving the conjunctive, three-prong test that: "(A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact;

*and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." <u>Somers</u>, 454 Mass. at 590–91.

Lyft cannot meet its burden to justify independent contractor status for its drivers under the "ABC" test because its drivers perform services in the usual course of Lyft's business as a transportation service, and thus, Lyft cannot prove Prong B. Here, based on the strength of the Prong B analysis, and the "probable outcome," Plaintiff's success on the merits is "great."[14]

Here, Lyft simply cannot show that the Plaintiff and similarly situated drivers perform work that is outside Lyft's usual course of business – namely, providing transportation services. Lyft's drivers comprise the core of its business; without its drivers, Lyft could not exist. Lyft cannot camouflage its usual course of business through linguistic gymnastics that frame the company as merely arranging rides. <u>See also</u> <u>Massachusetts Delivery Ass'n v. Coakley</u>, 2014 WL 4824976, *7, note 4 (1st Cir. Sept. 30, 2014) ("[t]here can be no dispute that [couriers] act in the course of business for the delivery companies, even if one performs the deliveries and the other arranges the deliveries.").[15] Here, there can be no dispute that the Lyft drivers "are engaged in

_____

[14]    This conclusion is underscored by the passage of A.B. 5, which illuminates application of Mass. Gen. L. c. 149 § 148B, to "gig economy" companies, like Lyft. Not only does the California legislature and public understand the Bill to act as a directive to Lyft to reclassify its drivers as employees, <u>see</u> <u>supra</u> p. 3 at note 1 – the legislature explicitly stated that the bill clarified that the "ABC" test will "increase the categories of individuals [classified as employees and therefore] eligible to receive benefits from, and thus would result in additional moneys being deposited into, the Unemployment Fund." 2019 California Assembly Bill No. 5, California 2019-2020 Regular Session (Preamble). As the bill acknowledges, this expansion comes not from a change in the law, but rather from the declaration that the law represents: "gig economy" companies like Lyft must come into compliance with "ABC" test.

[15]    <u>See also</u> <u>Carey v. Gatehouse Media Massachusetts I, Inc.</u>, 92 Mass. App. Ct. 801, 807, 813–14 (2018) (affirming grant of summary judgment to plaintiff drivers under Prong B); <u>Schwann et al v. FedEx Ground Package Sys., Inc.</u>, 2013 WL 3353776, *5 (D. Mass. July 3, 2013) (rejecting defendant's attempt to characterize its business as 'logistics' rather than delivery services and noting, "[w]hether intended as shorthand for a more metaphysical purveyor of logistics business entity or not, FedEx advertises that it offers package pick-up and delivery services and its customers have no reason to believe otherwise"); <u>Chaves v. King Arthur's Lounge</u>, 2009 WL 3188948 (Mass. Super. July 30, 2009) (rejecting defendant strip club's attempt to deny that exotic dancers performed services in the ordinary course of its  business and

the exact business" as Lyft and that drivers perform the service of transporting passengers.

Furthermore, Lyft holds itself out as providing transportation services. See Cotter 60 F.Supp.3d at 1069 ("[Lyft] markets itself to customer as an on-demand ride service, and it actively seeks out those customers."). Because a worker's "service" falls within the scope of an employer's "usual course of business" where the employer holds itself out as offering the service or defines its business to include that service, Lyft drivers' transportation services fall within Lyft's usual course of business. See Schwann, 2013 WL 3353776, *4 (noting the SJC "has determined that a service falls within an employer's usual course of business if the putative employer defines its business as including the service"). Therefore, Plaintiff has shown a strong likelihood of success on the merits regarding the "ABC" test, on Prong B alone.

In opposing this complaint, Lyft will undoubtedly attempt to rely on its arbitration clause in support of its claim that Plaintiff cannot seek such a ruling in this Court. However, this argument should not defeat Plaintiff's request for an injunction for multiple reasons.

First, this complaint seeks public injunctive relief, and a defendant should not be able to wield an arbitration clause in order to avoid such relief. In California, the Supreme Court has determined that claims for **public** injunctive relief, as provided by statute, cannot be avoided through the use of an arbitration clause. See McGill v. Citibank, N.A., 2.Cal.5th 945, 962 (2017).[16] Plaintiff submits that there is no difference between Massachusetts law and California

---

noting that "[a] court would need to be blind to human instinct to decide that live nude entertainment was equivalent to the wallpaper of routinely-televised matches, games, tournaments and sports talk in such a place"); Barbosa et all. v. Kilnapp Enter., Inc. d/b/a/ Real Clean et al., Mass. Superior Court C.A. No. 2013-00266-A (Norfolk Sup. Ct. June 13, 2014) (citing Oliveira v Advanced Delivery Sys., Inc., 2010 WL 4072360, *6-7 (Mass. Super Jul. 16, 2010) (rejecting defendant employer's claim that it was in the business of outsourcing the home delivery of furniture for retail furniture sellers rather than in the business of delivering furniture); Awuah v. Coverall, 707 F.Supp.2d 80, 82–85 (janitorial worker who performed cleaning services for a national cleaning company is employee under 148B, despite its attempt to call itself a "franchise company").

[16]     In McGill, the California Supreme Court ruled that a "provision in a predispute arbitration agreement that waives the right to seek this statutory remedy [of public injunctive relief] in any forum . . . is contrary to California public policy and is thus unenforceable under

law on this point, and that Massachusetts law will follow <u>McGill</u>.  Public injunctive claims

brought under Mass. Gen. L. c. 149 § 150 for § 148B and related wage violations have

heightened public importance.  As discussed <u>supra</u> at p. 10, the independent contractor statute is

designed to protect employees from being deprived of the protections of the Massachusetts Wage

and Overtime laws, and the Commonwealth has specifically provided for an employee who has

been misclassified and alleges a violation of 148B to seek injunctive relief.  <u>See</u> Mass. Gen. L. c.

149 § 150.  As outlined <u>infra</u> in the following sections, misclassification presents an enormous

harm to the public; given the public interest at stake in enforcing 148B and its grant of

protections of Massachusetts wage laws (and public's reliance on private enforcement),

Massachusetts law will follow the rule in <u>McGill</u> such that the right to claims for public

injunctive relief cannot be thwarted through the use of an arbitration clause.[17]

Second, Lyft's eventual motion to compel arbitration will also likely fail because the

Federal Arbitration Act ("FAA") is inapplicable in this case, since Lyft drivers fall within the

transportation worker exemption because they are transportation workers "engaged in foreign or

interstate commerce." 9 U.S.C. § 1; <u>see also</u> <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105,

118–19 (2001) (explaining that section 1 operates to exclude "contracts of employment of

transportation workers" who are engaged in interstate commerce).  The Third Circuit in <u>Singh v.</u>

---

California Law." <u>Id.</u> at *951–52. In so holding, the Court focused on the fact that the public
injunction provided for under the statute was not incidental to the statute's primary purpose but
integral, and public injunctive relief was provided for under the statute "primarily 'for the benefit
of the greater public.'" <u>Id.</u> at 961 (quoting <u>Broughton v. Cigna Healthplans</u>, 21 Cal.4[th] 1066, VV
(1999)). "Accordingly, the waiver in a predispute arbitration agreement of the right to seek
public injunctive relief under these statutes would seriously compromise the public purposes the
statutes were intended to serve." <u>Id.</u> The Court further ruled that the FAA did not preempt the
state law at issue, Cal. Civ. Code § 3513 ("Any one may waive the advantage of a law intended
solely for his benefit. But a law established for a public reason cannot be contravened by a
private agreement."). <u>Id.</u> at 952, 961–67.

[17]     If the Court has any question on this matter, it could certify the issue to the Massachusetts
Supreme Judicial Court.  Plaintiff submits that the SJC would agree with the argument raised
here. <u>See</u>, e.g., <u>Feeney v. Dell Inc.</u>, 454 Mass 192, 199–206 (2009) ("[i]t is 'universally
accepted' that public policy sometimes outweighs the interest in freedom of contract, and in such
cases the contract will not be enforced." (quoting <u>Beacon Hill Civic Ass'n v. Ristorante Toscano,
Inc.</u>, 422 Mass. 318, 321 (1996), citing <u>Spence v. Reeder</u>, 382 Mass. 398, 413 (1981)).

<u>Uber Techs.</u>, 2019 WL 4282185 (3rd Cir., Sept. 11, 2019), recently ruled on precisely this point, recognizing that drivers who transport passengers may be exempt from the FAA, 9 U.S.C. § 1, under the transportation worker exemption (even though they transport passengers, rather than goods).  Together with <u>Waithaka v. Amazon</u>, 2019 WL 3938053, at *1–4 (Amazon drivers who transport goods that travel across state lines, even if the drivers themselves do not cross state lines, fall under the transportation worker exemption to the FAA), the Third Circuit's decision in <u>Singh</u> will allow Plaintiff to proceed in court, rather than be forced to arbitration.

Moreover, should these claims be compelled to arbitration, as outlined <u>infra</u> in Part III.A.v, the public harm would drag on for years – yet another reason that agreements to arbitrate public injunctive relief for Massachusetts wage law violations is contrary to public policy. Absent court intervention, Lyft drivers and the Massachusetts public (its taxpayers, its residents, and its workers) will suffer irreparable harm while awaiting resolution.  As outlined further below, a public injunction is needed prevent this harm is also in the public's best interest, and the balance of hardship tips sharply in favor of Plaintiff.

### iii.   Plaintiff, as Well as the Public, Will Suffer Irreparable Harm Absent the Issuance of Injunctive Relief

Irreparable harm is typically found when there exists no adequate remedy at law. <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).  While Lyft may argue that the "harm" at issue here is unpaid wages and reimbursements, which can be later remedied through compensation, such an argument must fail – and misses the point of this case and this motion.  As Plaintiff made clear in her complaint: "[t]he injunction that Plaintiff seeks is in the nature of a public injunction and is not solely for the benefit of herself and other Lyft drivers." <u>Id</u>. at ¶ 44.  As explained further below, the implications of Lyft's misclassification scheme are far-reaching and cannot be remedied through an award of damages.

First, Lyft's practice of misclassifying its drivers degrades the entire economy of the transportation industry and diminishes labor standards and wages of its drivers.  As long as Lyft maintains its policy of misclassification, Lyft drivers will continue to hemorrhage money daily, paying for their necessary business expenses, and engage in an endless chase to make enough to cover these costs and then make, in addition, enough to earn a living wage.  Even working full-time, Lyft drivers struggle to string together a livelihood, due to their failure to be protected by Massachusetts wage law.  The day-to-day harms that Lyft drivers suffer by not being able to meet their basic needs simply cannot be remedied at a later date; repaying lost wages will not remedy unpaid medical bills, or nights spent sleeping in a car to maximize (unreliable) Lyft wages.[18]  Notably, the "irreparable nature of a plaintiff's injury is heightened" when plaintiffs are young or in a fragile socioeconomic position; Lyft drivers are in a "fragile socioeconomic position," *due to* the misclassification policy, which further heightens the irreparable nature of the harm.  See Cavillo Manriquez v. Devos, 345 F.Supp.3d 1077, 1106–07 (N.D. Cal. 2018).

Moreover, the misclassification does irreparable harm to the Commonwealth of Massachusetts.  In Massachusetts, misclassification schemes cost the state millions, if not billions, of dollars.[19]  Two different studies have estimated that Massachusetts loses between $259 to $278 million annually; the more recent study was published in 2014, meaning the losses have presumably increased since these studies were conducted, given the increase in rides

---

[18]    See, e.g., Tracey Lien, *Most Uber and Lyft drivers in L.A. Work Full Time and Still Struggle To Make Ends Meet, Study Say,* L.A. Times, May 30, 2018 ("Many [] struggle to pay for expenses such as gas, insurance and vehicle maintenance costs[.]"); infra note 22.

[19]    The studies cited supra note 7, estimate the impact of misclassification schemes, as a whole, on the Commonwealth.  These numbers are also cited in the motion for injunctive relief that Plaintiff's counsel filed against Uber, in Capriole v. Uber Technologies, et al., D.Mass, C.A. No. 1:19-cv-11941, Dkt. 4.  Uber and Lyft **both** contribute to the high cost of misclassification in the Commonwealth, and have likely caused the cost to climb higher with their increased presence.  See supra not 7; Françoise Carré and Randall Wilson, *The Social and Economic Costs of Employee Misclassification in Construction* (Massachusetts), Report of the Construction Policy Research Center, Labor and Worklife Program at Harvard Law School, and Harvard School of Public Health, (Dec. 2004) (noting the transportation industry has the highest prevalence of misclassified workers in the Commonwealth).  The two companies, combined, compound the problem, and each individually poses irreparable harm.

provided by Lyft in Massachusetts in the past five years. See supra at p. 5 note 7. These estimates only count direct tax revenues lost and not the harder-to-quantify public funds used to provide public assistance to Lyft drivers who cannot afford their basic needs (including healthcare, housing, etc.). Lyft's misclassification scheme also fuels a race to the bottom, driving down wages and diminishing labor standards generally, thereby degrading other professional opportunities the drivers could pursue and making it more difficult for drivers to earn a living wage.[20]

Third, other businesses who must compete with the unfair business practices of Lyft, and who may comply or desire to comply with Massachusetts law, are harmed by the illegal misclassification of Lyft drivers. See 2019 California Assembly Bill No. 5, California 2019-2020 Regular Session, Section 1(b). Allowing companies like Lyft to avoid their responsibilities as an employer makes it difficult for competing companies to comply with their legal obligations as employers.

As a result, Plaintiff has shown that Lyft drivers are posed to suffer continued wage violations and loss of workplace protections – and that Massachusetts residents and taxpayers, who are in not employment relationship with Lyft, are *also* posed to suffer monetary and professional losses, as Lyft drains Massachusetts tax revenue and degrades the entire transportation (and "gig economy") industry in the Commonwealth.

### iv.  The Balance of Hardships Tips Sharply in Plaintiff's Favor

Plaintiff submits that the balance of hardships tips sharply in Plaintiff's favor. For this factor, the court considers "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld." Guilbert, 934 F.2d at 5.

---

[20]      Loss of professional opportunities constitutes irreparable harm, echoes throughout a worker's career. See e.g., Arizona Dream Act Coalition, 757 F.3d at 1068 ("no award of damages can compensate Plaintiff's for the myriad of person and *professional harm* caused by their inability to obtain a driver's licenses") (emphasis supplied).

As set forth above, Plaintiff is an individual who has brought wage claims against Lyft, contending that he and other drivers have suffered wage violations.  Lyft drivers are posed to suffer continued wage violation, limitations on professional opportunities, and a prolonged public and court battle against the company. See also discussion infra Part III.A.v.  The hardship she and other drivers will experience if interim relief is not granted is severe: the Commonwealth will continue to rack up millions (if not billions) in lost payroll taxes, and taxpayers will be paying into public benefits to subsidize the livelihood of Lyft drivers who cannot subsist on income from Lyft without the benefit of Massachusetts wage law protections.

In contrast Lyft is a massive international corporation, was recently earned a $24 billion valuation in March of 2019.[21]  If Lyft is enjoined from classifying its drivers as independent contractors, any financial harm, immediate or otherwise, pales in comparison to that shouldered by its drivers. See supra at p. 17 note 18.[22]  Thus, the balance of hardships in this case tips sharply against Lyft and towards Plaintiff.

### v.  An Injunction is in the Public Interest

Finally, enjoining Lyft's conduct is in the public interest. As discussed supra in Part III.A.iii, the irreparable harm suffered by **both** the Plaintiff and the public is enormous.  Were this Court not to enjoin Lyft's conduct, it would present a free pass to any employer accused of misclassifying its employees as independent contractors (or of any wage violations) and

---

[21]     Carl O'Donnell and Joshua Franklin, *Lyft Valued at $24.3 Billion in First Ride-Hailing IPO*, Reuters, March 28, 2019, https://www.reuters.com/article/us-lyft-ipo/lyft-valued-at-24-3-billion-in-first-ride-hailing-ipo-idUSKCN1R92P4 (last accessed Sept. 12, 2019).

[22]     Johana Bhuiyan, *Lower Pay and Higher Costs: The Downside of Lyft's Car Rental Program*, L.A. Times, May 20, 2019 (describing driver who was forced to sleep and live in his car, despite working 20 to 60 hours a week for Lyft). See also Eric Newcomer and Olivia Zaleski, *When Their Shifts End, Uber Drivers Set Up Camp in Parking Lots Across the U.S.*, BLOOMBERG, Jan. 23, 2017 ("These drivers live near, but not in, expensive cities where they can tap higher fares, ferrying wealthier, white-collar workers to their jobs and out to dinner—but where they can't make enough money to get by, even with longer hours. To maximize their time, drivers find supermarket parking lots, airports and hostels where they catch several hours of sleep after taking riders home from bars and before starting the morning commute. In a sense, drivers sleeping in their cars typifies, in an extreme way, what Uber said it does best: offer drivers flexibility.").

engaging in an end run around § 148B. The public harm presented here is enormous, as evidenced by the immense amount of time and energy to pass, and media attention paid to the passage of, AB 5 in California.  Lyft cannot be given a free pass; Lyft drivers and the public need the protections of the Massachusetts wage law.[23]

Moreover, to not issue a preliminary injunction would result in (extreme) delay.  As demonstrated by the previous years of litigation against Lyft regarding its misclassification policy, see Bekele v. Lyft, Inc., D. Mass, C.A. 1:15-cv-11650, litigation will be dragged out, while Plaintiff and the public await decisions on Lyft's arbitration clause. The public cannot wait more years for Lyft to come into compliance with § 148B, which was law before the company even introduced its services in the Commonwealth.  As outlined supra in the Introduction and Part III.A.iii., every day that Lyft continues its misclassification scheme costs the Commonwealth of Massachusetts, its taxpayers, complying competitors, the entire transportation industry and its workers – Plaintiff and other Lyft drivers included – both in terms of dollars and dignity.  This ongoing harm that the public and the Plaintiff continue to suffer as a result of Lyft's misclassification – and will continue to suffer daily, for years, should this injunction not issue – cannot be remedied later.  For these reasons, the Court should grant Plaintiff's request for a public injunction.

## IV.   __CONCLUSION__

For the foregoing reasons, this Court should immediately enjoin Lyft from misclassifying its drivers as independent contractors, rather than as employees.  This injunction should require that Lyft reclassify its drivers as employees and henceforth comply with Massachusetts wage laws.

---

[23]   Plaintiff's counsel has already sought the same preliminary injunctive relief against both Uber and Lyft in California. See Mcray v. Uber Technologies, Inc., N.D. Cal., C.A. No. 4:19-cv-05723-DMR; Seifu, et al. v. Lyft, Inc., Superior Court, County of Los Angeles, Case No. BC712959.

Dated: September 23, 2019

Respectfully submitted,

MELODY CUNNINGHAM, on behalf of herself
and all others similarly situated,

By her attorneys,

_____/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO# 640716
(sliss@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801

## **LOCAL RULES 7.1(A) CERTIFICATION**

Counsel for Plaintiff Melody Cunningham, certifies that she conferred in good faith with

counsel for defendants on September 23, 2019, in an effort to resolve or narrow the issue

presented by this motion.  Because the underlying complaint (and this motion) is in the process

of being served on Defendants, Plaintiff's counsel conferred with the following counsel for

Defendant Lyft, Inc.:

HOLLAND & KNIGHT LLP
JAMES D. SMEALLIE, BBO No. 467380
jd.smeallie@hk.law.com
DAVID J. SANTEUSANIO, BBO No. 641270
david.santeusanio@hklaw.com
MICHAEL T. MARONEY, BBO No. 653476
michael.maroney@hklaw com
ROBERT M. SHAW, BBO No. 669664
robert.shaw@hklaw.com
NATHANIEL F. HULME, BBO No. 678447
nathaniel.hulme@hklaw.com
10 St. James Avenue
Boston, MA 02116
Tel: (617) 523-2700
Fax:(617)523-6850

KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER, SBN 192813
  rslaughter@keker.com
JO W. GOLUB, SBN 246224
  jgolub@keker.com
ERIN E. MEYER, SBN 274244
  emeyer@keker.com
MORGAN E. SHARMA, SBN 313863
  msharma@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415.391.5400
Facsimile:    415.397.7188

_____/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, Esq.

PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR INJUNCTIVE RELIEF

## <u>CERTIFICATE OF SERVICE</u>

I, Shannon Liss-Riordan, hereby certify that a copy of this document and all supporting documents referenced herein are in the process of being served on the Defendants, along with the underlying complaint; they were delivered via electronic mail to the following counsel for Lyft:

HOLLAND & KNIGHT LLP
JAMES D. SMEALLIE, BBO No. 467380
jd.smeallie@hk.law.com
DAVID J. SANTEUSANIO, BBO No. 641270
david.santeusanio@hklaw.com
MICHAEL T. MARONEY, BBO No. 653476
michael.maroney@hklaw com
ROBERT M. SHAW, BBO No. 669664
robert.shaw@hklaw.com
NATHANIEL F. HULME, BBO No. 678447
nathaniel.hulme@hklaw.com
10 St. James Avenue
Boston, MA 02116
Tel: (617) 523-2700
Fax:(617)523-6850

KEKER, VAN NEST & PETERS LLP
R. JAMES SLAUGHTER, SBN 192813
   rslaughter@keker.com
JO W. GOLUB, SBN 246224
   jgolub@keker.com
ERIN E. MEYER, SBN 274244
   emeyer@keker.com
MORGAN E. SHARMA, SBN 313863
   msharma@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415.391.5400
Facsimile:      415.397.7188


_____/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, Esq. BBO# 640716