## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MELODY CUNNINGHAM and
FRUNWI MANCHO, individually and on
behalf of all others similarly situated,

      Plaintiffs,

v.

LYFT, INC., LOGAN GREEN, and JOHN
ZIMMER,

      Defendants.

Case No. 1:19-cv-11974-IT

## PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

I.      **INTRODUCTION**

Plaintiffs bring this emergency motion seeking a preliminary injunction against

Defendants, Lyft, Inc. ("Lyft"), Logan Green, and John Zimmer, ordering them to comply with

Massachusetts law and classify Lyft drivers as employees, as required by M.G.L. c. 149 § 148B,

which will make them eligible for paid sick leave provided by M.G.L. c. 149 § 148C.  The recent

international outbreak of COVID-19 (the "coronavirus") has now made starkly clear the need for

immediate action in the form of an emergency public injunction ordering Lyft to classify its

Massachusetts Lyft drivers as employees: the need to mandate that Lyft provide its drivers with

paid sick time as required by state law.

Because Lyft classifies its drivers as independent contractors rather than employees, it

does not even attempt or pretend to satisfy the requirements of the Massachusetts Earned Sick

Time Law, M.G.L. c. 149 § 148C.  This violation is now a public emergency.  Massachusetts has

already declared a state of emergency due to the coronavirus[1] and now, without the benefit of

paid sick leave, Lyft drivers will continue to work even while feeling ill because they need to

earn a living and provide for their basic necessities – and thus risk infecting the general public

with the coronavirus disease. The purpose of paid sick leave is to compensate employees who

miss work due to illness and thus make it more possible for them to stay home while sick and

recover.  Without this benefit, thousands of Lyft drivers across Massachusetts will not be in a

position to be able to follow public health recommendations to stay home while sick and will

thus put the public at risk. Denying Lyft drivers paid sick leave as required by law in the midst of

this emergency[2] harms the public *and* the drivers by undermining public health efforts to prevent

---

[1]     Massachusetts Exec. Order No. 5891: Declaration of a State of Emergency to Respond to COVID-19 (March 10, 2020), available at https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (last accessed March 15, 2020).

[2]     Lyft has stated that it plans to provide (an undefined amount of) compensation to drivers who are diagnosed with coronavirus. See *Lyft's Latest Info on Coronavirus*, Lyft Safety, https://www.lyft.com/safety/coronavirus#driver (last accessed March 12, 2020).  However, the Massachussetts Earned Sick Time law does **not** require a diagnosis (nor even an advance doctor's note); Lyft's new voluntary policy therefore falls short of the requirements of Massachusetts law.

the spread of the coronavirus.[3]  This exponential harm cannot be remedied later, and the Court should act now.

Further, as Plaintiffs noted in their previous filings seeking injunctive relief, because Plaintiffs are seeking *public* injunctive relief, Lyft should not be able to wield its arbitration clause to block such relief. See Dkt. 4, at 14-15 (arguing that Massachusetts law would follow California law in exempting public injunctive relief from arbitration, under McGill v. Citibank, N.A., 2.Cal.5th 945, 962 (2017)).  Now, the impact on the public of Lyft's failure to classify its drivers as employees is even more stark.  As Plaintiffs also argued earlier, Lyft likewise cannot block this relief through use of its arbitration clause because Lyft drivers like Plaintiffs fall under the Section 1 transportation worker exemption to the Federal Arbitration Act. Id., at 15.

Accordingly, Plaintiffs now seek an emergency preliminary injunction to enjoin Lyft from misclassifying its drivers as independent contractors, in order to prevent (further) irreparable harm.  As outlined below, Plaintiffs are able to establish the four factors the Court must evaluate in granting a preliminary injunction: (1) Plaintiffs are likely to succeed on the merits of their claims; (2) Plaintiffs (as well as the Massachusetts and public at large) will suffer irreparable injury in absence of a preliminary injunction; (3) such injury outweighs any harm to Lyft; and, (4) the injunction will not harm public interest (but is rather in the public interest). See Lanier Prof'l Serv., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).

**First**, Plaintiffs can establish a likelihood of success on the merits of their claim that they have been misclassified under Massachusetts law; that Lyft is not complying with Massachusetts paid sick leave law; and that Lyft will not be able to use its arbitration agreement to block this

---

[3]     In recognition of the threat to public health as a result of employers denying paid sick leave during this pandemic, Congress has been developing emergency legislation that attempts to address the issue.  The House of Representatives passed a bill this weekend providing two weeks of paid sick leave to **some** workers.  Emily Cochrane & Jim Tankersley, *Here's What's in Congress's Emergency Coronavirus Bill*, N.Y. Times, March 14, 2020, available at https://www.nytimes.com/2020/03/14/us/politics/congress-coronavirus-bill.html (last accessed March 15, 2020).  However, the bill would exclude Lyft drivers should they not be recognized as employees. Shannon Liss-Riordan, *Coronavirus Bill Includes Sick Leave, But Not for Gig Workers*, Boston Globe, March 15, 2020, available at https://www.bostonglobe.com/2020/03/15/opinion/coronavirus-bill-includes-sick-leave-not-gig-workers/ (last accessed March 15, 2020).

claim.  Significantly, the Court does not need to make a final ruling on any of these issues now, but must only consider whether Plaintiffs have a *likelihood* of success on these questions.

As to employee status, under the Massachusetts "ABC" test, an individual who performs services in the "usual course of business" is an employee as a matter of law. See M.G.L. c. 149 § 148B(a)(2); Somers v. Converged Access, Inc., 454 Mass. 582, 590-91 (2009) (alleged employer must prove all three prongs of the three-part test of § 148B in order for individual to be properly classified as an independent contractor); Carey v. Gatehouse Media Massachusetts I, Inc., 92 Mass. App. Ct. 801, 807, 813–14 (2018) (affirming grant of summary judgment to plaintiffs based upon defendant's inability to satisfy Prong B of the ABC test).[4]  Lyft cannot present a straight-faced argument that it can satisfy the B prong of the ABC test (under either Massachusetts, or now California, law).[5]  Lyft is a transportation company, and Lyft depends upon its drivers to sustain and carry out its transportation business.  See Cotter v. Lyft, 60 F.Supp.3d 1067, 1069 (N.D. Cal. 2015)  ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one");  see also O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1144 (N.D. Cal. 2015) ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business."). There can really be no doubt that drivers perform services in Lyft's "usual course of business" and thus would be employees under Prong B of M.G.L. c. 149 § 148B.

As to the sick leave violation, Lyft does not even pretend to be in compliance with the

---

[4]     California recently followed Massachusetts' lead in adopting this strict "ABC test," first judicially (see Dynamex Operations W., Inc. v. Superior Court, 4 Cal.5th 903, 956–57 (2018)) and then legislatively (see Assembly Bill No. 5 ("A.B. 5")).  In California, the legislature and public widely appear to understand an important purpose of the ABC test is to ensure that "gig economy" workers, such as Lyft drivers, get classified as employees.  See, e.g., Kate Conger and Noam Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. TIMES, Sept. 11, 2019 ("California legislators approved a landmark bill on Tuesday that requires **companies like** Uber and **Lyft** to treat contract workers as employees") (emphasis supplied). The bill has even been dubbed the "gig labor bill" and described as "dealing a potential body blow to gig economy players, **like** Uber and **Lyft**." Cheryl Miller, *Newsom Signs Landmark Gig Labor Bill, as Court Cases Loom*, THE RECORDER, Sept. 18, 2019; *Calif. Gov. Signs Worker Misclassification Bill Into Law*, LAW360, Sept. 18, 2019.

[5]     Plaintiffs' counsel is also seeking a preliminary injunction in a new Lyft misclassification suit they have filed in California seeking paid sick leave for the drivers under California law. Rogers v. Lyft, Inc., CGC-20-583685 (Cal. Sup. Ct.) (filed March 12, 2020).

Massachusetts Earned Sick Time Law.  Should Plaintiffs establish that Lyft misclassifies its drivers as independent contractors (as set forth above), there will be no dispute that Lyft is in violation of M.G.L. c. 149 § 148C.

Lastly, as argued in Plaintiffs' previous filing seeking injunctive relief, Dkt. 4 at 14-15, Lyft cannot wield its arbitration clause to block Plaintiffs' claim for public injunctive relief, McGill v. Citibank, N.A., 2.Cal.5[th] 945, 962 (2017), and because Plaintiffs are exempt from the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, as they fall within the transportation worker exemption to the Act, see Singh v. Uber Techs., 2019 WL 4282185 (3rd Cir., Sept. 11, 2019).

**Second**, it should be readily apparent that Plaintiffs (as well as the Commonwealth and general public) will suffer irreparable harm should an injunction not issue, forbidding Lyft from misclassifying its drivers and mandating Lyft to comply with Massachusetts sick pay law.  Lyft's failure to provide paid sick days now means that Lyft drivers will need to work while sick to make ends meet and substantially increases the risk that Lyft drivers will spread illnesses to the general public.  Lyft drivers like Plaintiffs may drive **dozens** of passengers each day – and are clearly not able to maintain the six foot distance from their passengers recommended by experts to prevent the rapid spread of COVID-19 (the "coronavirus"),[6] which the World Health Organization classified last week as a pandemic.[7]  In the face of this global crisis, there appears a resounding consensus: "Companies that do not pay sick workers to stay home are endangering their workers, their customers and the health of the broader public."[8]  Massachusetts has adopted a paid sick leave law, and the only thing standing in the way of Lyft drivers receiving this critical benefit is Lyft's refusal to acknowledge that its drivers are employees under Massachusetts law,

---

[6]      The Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): How to Protect Yourself*, available at https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last accessed March 16, 2020).

[7]      World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020   (last accessed March 11, 2020).

[8]      The Editorial Board, *The Companies Putting Profits Ahead of Public Health*, N.Y. Times, March 14, 2020 ("Studies show that paying for sick employees to stay home significantly reduces the spread of the seasonal flu. There's every reason to think it would help to check the new coronavirus, too.")

M.G. L. c. 149 § 148B.

**Third**, the injury that Plaintiffs (as well as the Commonwealth and general public) would suffer in the absence of an injunction outweighs any potential harm to Lyft.  There can be no serious argument that preventing the spread of a pandemic is outweighed by the cost to Lyft of coming into compliance with § 148C.  Lyft has simply ignored the laws of the Commonwealth for years, and now the consequences are being wrought in dire form.

**Fourth,** it is not in the public interest to allow Lyft to continue to misclassify its drivers and inflict public harm on the Commonwealth and the public.  Lyft should not be allowed to use litigation tactics to stall resolution and enforcement of § 148B and § 148C no matter the consequences.  Plaintiffs and the public simply cannot wait years, or even weeks, for Lyft to comply with Massachusetts Earned Sick Time Law.  In the interim, the rapid proliferation of the virus that occurs will be irreversible.

This is no ordinary moment in time and, as illustrated by the years of litigation of this misclassification issue against Lyft, this is no usual case.  The current version of the "ABC test" has been the law in Massachusetts since 2004. See 2004 Mass. Legis. Serv. Ch. 193 (S.B. 2358) (WEST) (approved July 19, 2004).  Lyft clearly cannot satisfy the "ABC test" and thus Lyft cannot justify classifying its drivers as independent contractors.[9]  The consequences of this misclassification are only heightened by the current crisis we face.

For the foregoing reasons, and as outlined below, this Court should order an emergency preliminary injunction enjoining Lyft from continuing to misclassify its drivers and ordering that Lyft classify its drivers as employees and provide paid sick leave so as to prevent irreparable harm to Lyft drivers and the public.  The Commonwealth cannot afford to wait for another lengthy battle to bring Lyft into compliance with § 148B and § 148C – both statutes that are vital to protecting Lyft drivers and the public in this time of crisis.

---

[9]      Plaintiffs do not believe that Lyft can satisfy *any* of the three prongs, but there is no question that Lyft cannot satisfy Prong B and that, alone, is enough to establish that Lyft has misclassified its drivers as independent contractors.

## II.      **FACTUAL AND PROCEDURAL BACKGROUND**

On September 17, 2019, Plaintiff Cunningham filed this class action complaint alleging

that Lyft has misclassified its drivers as independent contractors, when the reality of the situation

is that they are employees of Lyft and therefore entitled to employment protections under

Massachusetts state law. See Compl. Dkt-1, at ¶2.  On September 23, 2019, Plaintiff moved for

preliminary injunctive relief against Lyft for misclassifying Massachusetts drivers as

independent contractors based on the argument that Lyft has exacted an irreparable, public harm

on the Commonwealth of Massachusetts by diminishing labor standards, depriving the state of

tax revenue, and costing the state and taxpayers money in public assistance that is needed for

Lyft drivers who cannot meet their basic needs due to their being deprived of their rights under

the Massachusetts wage laws. Dkt. 4.  Although it has not yet issued a ruling on the motion, the

Court indicated at the December 9, 2019, hearing that the motion for injunctive relief would be

denied.  Hr'ing Tr., Dec. 9, 2019, at 32.[10]  The parties currently await a ruling on the pending

preliminary injunction motion and on Defendant's Motion to Compel Arbitration. See Dkts. 16-

17 (filed Oct. 3, 2019).

Plaintiff Cunningham is an adult resident of Weymouth, Massachusetts, where she has

been driving for Lyft since June 2013. Second Am. Complaint ¶8.  Plaintiff Mancho is an adult

resident of Methuen, Massachusetts, where he has worked as a Lyft driver since approximately

January 2016. Id. ¶9.  Lyft has misclassified Plaintiffs, and other Lyft drivers throughout

Massachusetts, as independent contractors. Id. ¶18.  As a result of this misclassification,

Plaintiffs and other Lyft drivers have suffered a variety of Massachusetts wage law violations,

including being denied paid sick leave pursuant to M.G.L. c. 149 § 148C. Id. ¶2.  On March 12,

2020, Plaintiffs submitted an emergency motion to amend their complaint, and a proposed

---

[10]      At the hearing, the Court also discussed whether Plaintiffs may need to show the crossing
of state lines in order to establish that Lyft drivers fall under the Section 1 Transportation Worker
exemption to the FAA.  Hr'ing Tr., Dec. 9, 2019, at 44-45.  While Plaintiffs do not believe the
drivers themselves need to cross state lines, in order to bolster their argument, they filed an
Amended Complaint, adding Plaintiff Mancho. See Dkt. 61.

Second Amended Complaint, in order to add a claim alleging violation of § 148C, the importance of which became stark in light of the coronavirus pandemic. See Dkt. 68-1.

Massachusetts follows a stringent "ABC test," under Mass. Gen. L. c. 149 § 148B, which, until the California Dynamex decision in 2018, was the strictest law in the country prohibiting independent contractor misclassification.  This test contains three conjunctive prongs, all of which an alleged employer must satisfy in order to justify classifying a worker as an independent contractor. See Somers., 454 Mass. at 590-91; Depianti v. Jan-Pro Franchising Intern., Inc., 465 Mass. 607, 621 (2013) ("[T]he statute lays out three indicia of an independent contractor relationship, all three of which must be established to rebut the presumption of employment.").  The B prong requires an alleged employer to prove that the worker performs services outside its usual course of business.

Lyft will simply not be able to satisfy Prong B of this test.  Lyft drivers provide transportation services, and Lyft is a transportation company.[11]  California recently followed Massachusetts's adopted the "ABC" test, by codifying the test through A.B. 5, popularly known as the "gig economy" bill, in order to eliminate independent contractor misclassification in the "gig economy."[12]  This measure shows the California state legislature seemed to assume that gig

---

[11]    As noted in the introduction, although Lyft may claim that it is not a transportation company, but is instead a mere "platform", this argument does not pass the straight-face test and has already been rejected in federal court. See Cotter, 60 F.Supp.3d at 1069 ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one"); id. at 1069 ([Lyft drivers] work is central, not tangential, to Lyft's business"); see also O'Connor, 82 F. Supp. 3d at 1144 ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business.").

[12]    The California Supreme Court specifically chose to adopt Massachusetts's "ABC" test in Dynamex, 4 Cal.5th 903, in order to protect the public and create a clear line which would prohibit employers like Lyft from continuing to misclassify their workers, when their workers provide the employer's core service.  Because employers, particularly those in the "gig economy" continued their scheme of misclassifying their workers as independent contractors, even after the Supreme Court's ruling in Dynamex, the California state legislature passed a bill to codify Dynamex and solidify the adoption of the Massachusetts "ABC" test.  See Cal. Lab. Code § 2750.3. It is widely recognized in California that the purpose of the bill is to require that employers – notably Uber and Lyft and the rest of the "gig economy" – reclassify their workers as employees. Miller, supra note 4. The California state legislature passed the 2019 California Assembly Bill No. 5 ("AB 5") on September 11, 2019, which aimed at Lyft's misclassification policy. See discussion supra note 4; Kate Conger and Noam Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. Times, Sept. 11, 2019.

economy companies such as Lyft could not carry the burden needed under the "ABC" test to justify classifying their workers as independent contractors. This assumption seems to have been borne out by the courts, as a judge recently issued a preliminary injunction ordering Instacart to stop misclassifying its "Shoppers" as independent contractors in California, based on the court's finding it more likely than not that Instacart would fail to carry its burden under the "ABC" test. See Ruling on Mot. For Preliminary Injunction, People of the State of California v. Maplebear, Inc., Case No. 2019-48731, at *4 (Ex. 1).

Meanwhile, in Massachusetts, Mass. Gen. L. c. 149 § 148B has been the law setting the standard for misclassification, in its current form, since 2004. The Massachusetts Supreme Judicial Court has repeatedly made clear the strength of this law and the importance to the Commonwealth of ensuring proper employee classification.[13] Despite the clear mandate of Mass. Gen. L. c. 149 § 148B and SJC decisions emphasizing the force of the statute, Lyft has engaged in an end-run around the statute for the entirety of its existence in Massachusetts. Lyft continued its misclassification scheme, despite legal challenges to it, see Wickberg v. Lyft, Inc., D. Mass, C.A. 18-12095, Bekele v. Lyft, Inc., D. Mass, C.A. 1:15-cv-11650, by deploying its arbitration clause and dragging these cases through years of litigation. Absent prompt court intervention, Lyft will not only continue to violate its drivers' basic rights, diminish labor

---

[13] As the SJC articulated in Somers, "[a] legislative purpose behind the independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." 454 Mass. at 592. The Court explained that to avoid an end run-around, the statute was one of strict liability: "Were employers who violated the statute permitted a 'safe harbor' that allowed them to demonstrate that they would have paid the employee less had they known he or she was not an independent contractor, there would be no financial incentive to ensure employer compliance, and employees would be left with no meaningful protection from misclassification." Id. at 591–92.

Similarly, in Depianti, 465 Mass. 607, 620, the SJC reinforced its declaration of the importance of the independent contractor statute. The Court noted that the statute, which should be liberally construed, is designed "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Id. at 620 (quoting Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 198 (2013)). The SJC has also repeatedly declared the importance of not allowing end-runs around the Massachusetts wage laws. Depianti, 465 Mass. at 623 ("To allow such an 'end run' around G.L. c. 149, § 148, would contravene the express purpose of the statute and would nullify the provision therein that specifically forbids this type of special arrangement[.]"); DiFiore v. American Airlines, Inc., 454 Mass 486, 496 (2009) (emphasizing that Court would not countenance an "end run" around the Wage Act).

standards, and put the onus on the public to provide a financial safety net for drivers who are sick and unable to work, but it will risk spreading the coronavirus even further, as drivers will inevitably keep working while sick if they are not receiving state-mandated sick pay.  In short, Lyft is asking the public to subsidize—and bear the risk of – its dangerous practice of denying paid sick leave, which constitutes a public health threat and ongoing harm to its drivers, the Commonwealth, and the general public.  This Court should therefore grant preliminary injunctive relief and enjoin Lyft from classifying its drivers in Massachusetts as "independent contractors" and order Lyft to classify its drivers as employees and comply with Massachusetts wage laws.

## III.   <u>LEGAL ARGUMENT</u>

This Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a) and (b).  In order to prevail on a motion for a preliminary injunction, Plaintiffs must establish (1) likelihood of success on merits; (2) that plaintiffs will suffer irreparable injury in absence of a preliminary injunction; (3) that such injury outweighs any harm to the defendants; and, (4) that the injunction will not harm public interest. <u>Ricci</u>, 192 F.3d at 3 (1st Cir. 1999).  "A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests." <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F. F.3d 151, 163 (1st Cir. 2004).  As set forth below, Plaintiffs meet all these requirements and has demonstrated that a "potent weapon" is necessary in this case, due to Lyft's continued refusal to properly classify its drivers as employees, in compliance with the "ABC test" of Mass. Gen. L. c. 149 § 148B.

### A.    **Plaintiffs Have Shown Likelihood of Success on the Merits**

"[A] court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991).  Notably, when "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." <u>E.E.O.C. v. Astra U.S.A., Inc.</u>, 94 F.3d. 738, 743–44 (1st Cir. 1996).

Should Plaintiffs establish that Lyft has misclassified its drivers as independent

contractors, then violation of the Massachusetts Earned Sick Time Law is clear, since Lyft does not even believe itself to be covered by the law and is not complying with it.[14]

Under the "ABC" test, workers are presumed to be employees. See Mass. Gen. L. c. 149 § 148B.  The putative employer bears the burden of proving the conjunctive, three-prong test that: "(A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." Somers, 454 Mass. at 590-91.

Lyft cannot meet its burden to justify independent contractor status for its drivers under the "ABC" test because its drivers perform services in the usual course of Lyft's business as a transportation service, and thus, Lyft cannot prove Prong B.[15]  Here, based on the strength of the

---

[14]     Lyft may attempt to argue that its policy issued on Wednesday, March 11, 2020, in light of the emergent crisis, somehow mitigates its violation of § 148C. This argument must fail.

**(1)** The policy does not comply with the statute as it requires a driver to obtain a COVID-19 diagnosis or be put under quarantine and merely states it will provide "funds" for drivers (rather than gauranteeing pay). COVID-19 tests are in notably short supply, such that receiving the official diagnosis or quarantine Lyft requires for this "benefit" is exceedingly unlikely. Robinson Meyer and Alexis C. Madrigal, *The Dangerous Delays in U.S. Coronavirus Testing Haven't Stopped*, The Atlantic, March 9, 2020 https://www.theatlantic.com/health/archive/2020/03/coronavirus-testing-numbers/607714/.

**(2)** The policy does nothing to mitigate the public harm as public health recommendations advise to stay home *as soon as* a person begins feeling sick, and to maintain a six foot distance to prevent the spread of COVID-19, which Lyft drivers cannot do in close quarters with passengers. Even if drivers could reliably get tested for COVID-19, Lyft's policy thus does nothing to encourage social-distancing at the critical moment *before* a diagnosis, when drivers first feel the onset of symptoms or become aware of potential exposure to COVID-19. The median incubation period of COVID-19 is approximately five days.  If Lyft only provides assistance upon diagnosis drivers who need to keep working to make ends meet will continue providing rides during this period, potentially exposing hundreds of additional individuals to COVID-19. *See* Jonathan Elchberger *Coronavirus Symptoms Start About Five Days After Exposure, Johns Hopkins Study Finds*, Johns Hopkins University, March 9, 2020. https://hub.jhu.edu/2020/03/09/coronavirus-incubation-period/. Lyft must instead comply with Massachusetts's paid sick leave law, which would allow drivers to take paid time off when they first feel symptoms or become aware of potential exposure to COVID-19.

[15]     Recently, a California Superior Court has issued a preliminary injunction against the gig economy company Instacart, finding that the State had demonstrated it was likely to prevail on the merits of the independent misclassification claim under the "ABC" test.  See Ruling on Mot.

Prong B analysis, and the "probable outcome," Plaintiffs' success on the merits is "great."[16]

Lyft simply cannot show that Plaintiffs and similarly situated drivers perform work that is

outside Lyft's usual course of business – namely, providing transportation services.  Lyft's

drivers comprise the core of its business; without its drivers, Lyft could not exist.  Lyft cannot

camouflage its usual course of business through linguistic gymnastics that frame the company as

merely arranging rides.  See also Massachusetts Delivery Ass'n v. Coakley, 2014 WL 4824976,

*7, note 4 (1st Cir. Sept. 30, 2014) ("[t]here can be no dispute that [couriers] act in the course of

business for the delivery companies, even if one performs the deliveries and the other arranges

the deliveries."); Carey v. Gatehouse Media Massachusetts I, Inc., 92 Mass. App. Ct. 801, 807,

813–14 (2018) (affirming grant of summary judgment to plaintiff drivers under Prong B).[17]

---

For Preliminary Injunction, People of the State of California v. Maplebear, Inc., Case No. 2019-
48731, at *4 (Cal. Sup. Ct. Sept. 13, 2020) (attached hereto as Exhibit 1):

> At this point is it more likely than not that the People will establish at trial that the
> "Shoppers" perform a core function of defendant's business; that they are not free from
> defendant's control; and that they are not engaged in an independently established trade,
> occupation or business. Establishing any one of these would be enough[.] Id.

[16]    This conclusion is underscored by the enactment of A.B. 5, which illuminates application
of Mass. Gen. L. c. 149 § 148B, to "gig economy" companies, like Lyft. Not only does the
California legislature and public understand the Bill to act as a directive to Lyft to reclassify its
drivers as employees, see supra note 4 – the legislature explicitly stated that the bill clarified that
the "ABC" test will "increase the categories of individuals [classified as employees and
therefore] eligible to receive benefits from, and thus would result in additional moneys being
deposited into, the Unemployment Fund." 2019 California Assembly Bill No. 5, California 2019-
2020 Regular Session (Preamble).

[17]    See also Schwann et al v. FedEx Ground Package Sys., Inc., 2013 WL 3353776, *5 (D.
Mass. July 3, 2013) (rejecting defendant's attempt to characterize its business as 'logistics' rather
than delivery services and noting, "[w]hether intended as shorthand for a more metaphysical
purveyor of logistics business entity or not, FedEx advertises that it offers package pick-up and
delivery services and its customers have no reason to believe otherwise"); Chaves v. King
Arthur's Lounge, 2009 WL 3188948 (Mass. Super. July 30, 2009) (rejecting defendant strip
club's attempt to deny that exotic dancers performed services in the ordinary course of its
business and noting that "[a] court would need to be blind to human instinct to decide that live
nude entertainment was equivalent to the wallpaper of routinely-televised matches, games,
tournaments and sports talk in such a place"); Barbosa et all. v. Kilnapp Enter., Inc. d/b/a/ Real
Clean et al., Mass. Superior Court C.A. No. 2013-00266-A (Norfolk Sup. Ct. June 13, 2014)
(citing Oliveira v Advanced Delivery Sys., Inc., 2010 WL 4072360, *6-7 (Mass. Super Jul. 16,
2010) (rejecting defendant employer's claim that it was in the business of outsourcing the home
delivery of furniture for retail furniture sellers rather than in the business of delivering furniture);
Awuah v. Coverall, 707 F.Supp.2d 80, 82–85 (janitorial worker who performed cleaning services
for a national cleaning company is employee under 148B, despite its attempt to call itself a
"franchise company").

Here, there can be no dispute that the Lyft drivers "are engaged in the exact business" as Lyft and that drivers perform the service of transporting passengers.

Furthermore, Lyft holds itself out as providing transportation services. See Cotter 60 F.Supp.3d at 1069 ("[Lyft] markets itself to customer as an on-demand ride service, and it actively seeks out those customers."). Because a worker's "service" falls within the scope of an employer's "usual course of business" where the employer holds itself out as offering the service or defines its business to include that service, Lyft drivers' transportation services fall within Lyft's usual course of business. See Carey, 92 Mass. App. Ct. at 813–14. Therefore, Plaintiffs have shown a strong likelihood of success on the merits regarding the "ABC" test, on Prong B alone.

In opposing this motion, Lyft will undoubtedly again attempt to rely on its arbitration clause in support of its claim that Plaintiffs cannot seek such a ruling in this Court. See Dkts. 16-17. However, this argument should not defeat Plaintiffs' request for an emergency preliminary injunction for multiple reasons.

First, this complaint seeks public injunctive relief, and a defendant should not be able to wield an arbitration clause in order to avoid such relief. In California, the Supreme Court has determined that claims for *public* injunctive relief, as provided by statute, cannot be avoided through the use of an arbitration clause. See McGill v. Citibank, N.A., 2.Cal.5th 945, 962 (2017).[18] Plaintiffs submit that there is no difference between Massachusetts law and California

---

[18]    In McGill, the California Supreme Court ruled that a "provision in a predispute arbitration agreement that waives the right to seek this statutory remedy [of public injunctive relief] in any forum . . . is contrary to California public policy and is thus unenforceable under California Law." Id. at *951–52. In so holding, the Court focused on the fact that the public injunction provided for under the statute was not incidental to the statute's primary purpose but integral, and public injunctive relief was provided for under the statute "primarily 'for the benefit of the greater public.'" Id. at 961 (quoting Broughton v. Cigna Healthplans, 21 Cal.4th 1066, VV (1999)). "Accordingly, the waiver in a predispute arbitration agreement of the right to seek public injunctive relief under these statutes would seriously compromise the public purposes the statutes were intended to serve." Id. The Court further ruled that the FAA did not preempt the state law at issue, Cal. Civ. Code § 3513 ("Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."). Id. at 952, 961–67.

law on this point, and that Massachusetts law will follow McGill.  Public injunctive claims

brought under Mass. Gen. L. c. 149 § 150 for § 148B and related wage violations have

heightened public importance.  The independent contractor statute is designed to protect

employees from being deprived of the protections of the protections of remedial wage and hour

legislation, and the Commonwealth has specifically provided for an employee who has been

misclassified and alleges a violation of 148B to seek injunctive relief.  See Mass. Gen. L. c. 149 §

150.  As outlined infra in the following sections, misclassification presents an enormous harm to

the public, with downstream effects on public health and well-being, as we are seeing with the

global pandemic of coronavirus.  Given the public interest at stake in enforcing § 148B – both

generally and in this specific context – and its grant of protections of Massachusetts wage laws,

Plaintiffs submit that Massachusetts law would follow the rule in McGill such that the right to

claims for public injunctive relief cannot be thwarted through the use of an arbitration clause.[19]

Second, Lyft's motion to compel arbitration will also likely fail because the Federal

Arbitration Act ("FAA") is inapplicable in this case, since Lyft drivers fall within the

transportation worker exemption because they are transportation workers "engaged in foreign or

interstate commerce." 9 U.S.C. § 1; see also Circuit City Stores, Inc. v. Adams, 532 U.S. 105,

118–19 (2001) (explaining that section 1 operates to exclude "contracts of employment of

transportation workers" who are engaged in interstate commerce).  The Third Circuit in Singh v.

Uber Techs., 2019 WL 4282185 (3rd Cir., Sept. 11, 2019), recently ruled on precisely this point,

recognizing that drivers who transport passengers may be exempt from the FAA, 9 U.S.C. § 1,

under the transportation worker exemption (even though they transport passengers, rather than

goods).  Together with Waithaka v. Amazon, 2019 WL 3938053, at *1–4 (Amazon drivers who

transport goods that travel across state lines, even if the drivers themselves do not cross state

---

[19]     If the Court has any question on this matter, it could certify the issue to the Massachusetts
Supreme Judicial Court.  Plaintiffs submit that the SJC would agree with the argument raised
here. See, e.g., Feeney v. Dell Inc., 454 Mass 192, 199–206 (2009) ("[i]t is 'universally
accepted' that public policy sometimes outweighs the interest in freedom of contract, and in such
cases the contract will not be enforced." (quoting Beacon Hill Civic Ass'n v. Ristorante Toscano,
Inc., 422 Mass. 318, 321 (1996), citing Spence v. Reeder, 382 Mass. 398, 413 (1981)).

lines, fall under the transportation worker exemption to the FAA), the Third Circuit's decision in Singh will allow Plaintiffs to proceed in court, rather than be forced to arbitration.

Moreover, should these claims be compelled to arbitration, as outlined infra in Part III.B, the public harm would drag on for *years* – yet another reason that agreements to arbitrate public injunctive relief for Massachusetts wage law violations is contrary to public policy. As outlined further below, we are now facing a public health crisis.  An emergency public injunction is urgently needed prevent this harm, and the balance of hardship tips sharply in favor of Plaintiffs.

> ### B.     Plaintiffs, as Well as the Public, Will Suffer Irreparable Harm Absent the Issuance of Injunctive Relief

Irreparable harm is typically found when there exists no adequate remedy at law. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  While Lyft may argue that the "harm" here is too amorphous to measure, such an argument is incorrect and drastically underestimates (or simply ignores) guidance from experts and public health institutions.

The WHO has confirmed that we are in the midst of a global pandemic.[20]  Massachusetts has declared a state of emergency. See supra n. 1.  In Massachusetts alone—as of this writing— there are 164 confirmed cases of COVID-19, while thousands of residents may have already been exposed to the disease.[21]  Massachusetts has declared a state of emergency.[22] The CDC is

---

[20]     Bill Chappell, *Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO* Says, NPR, Mar. 11, 2020. https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says

[21]     Kaitlin McKinley Becker, *Baker Closes Schools, Restaurants Over Coronavirus*, NBC Boston, March 15, 2020, available at https://www.nbcboston.com/news/local/26-new-coronavirus-cases-in-massachusetts-164-total/2091478/ (last accessed March 15, 2020).

[22]     Massachusetts Exec. Order No. 5891: Declaration of a State of Emergency to Respond to COVID-19 (March 10, 2020), available at https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (last accessed March 15, 2020). The Administration is also filing emergency legislation in order to process unemployment claims more quickly, and in order to offer unemployment to workers whose workplace is shut down to mitigate the spread of coronavirus. Mass. Dep't Pub. Health, *COVID-19 Guidance*, available at https://www.mass.gov/info-details/covid-19-guidance-and-directives#other-guidance- (last accessed March 15, 2020).

unequivocal: workers should stay home if they feel sick, to stop the spread of the disease.[23]

By continuing to misclassify its drivers, Lyft is failing to provide them the basic workplace protections—to which they are legally entitled in Massachusetts—which would enable them to comply with this directive.  Even in ordinary circumstances, Lyft's failure to provide its drivers these basic workplace protections unacceptably increases the risk that its drivers and passengers will get sick and spread illnesses.  In the current climate, denying workers paid sick leave protections to which they are legally entitled under Massachusetts law poses an unacceptable risk to the health and safety of Lyft drivers, passengers, and the public at large.

The connection between public health and the availability of basic employment protections like paid sick leave is well established.[24]  A recent study found a that state-mandated access to paid sick leave policies reduced population-level flu infection rates by an average of eleven percent within the first year of the implementation.[25]  Unsurprisingly, low-wage workers like Plaintiffs are the most likely to lack these basic workplace protections[26]—here, because of Lyft's ongoing misclassification scheme.  Without the protections afforded by these and other workplace laws, workers like Plaintiffs are more likely to work while they are sick, increasing the likelihood they will transmit illnesses among the general public,[27] as misclassified workers

_____

[23]      The Center for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Steps When Sick*, available at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last accessed March 15, 2020).

[24]      See, e.g., Supriya Kumar, John J., et al., *Policies to Reduce Influenza in the Workplace: Impact Assessments Using an Agent-Based Model*, American Journal of Public Health 103, no. 8 (Aug. 1, 2013): pp. 1406–1411. https://doi.org/10.2105/AJPH.2013.301269 (concluding that paid sick day policies reduce influenza transmission owing to presenteeism, and thus reduce the burden of influenza illness in workplaces).

[25]      Stefan Pichler, Katherine Wen & Nicolas Ziebarth, *Positive Health Externalities of Mandating Paid Sick Leave*, ResearchGate, Feb. 2020, https://www.researchgate.net/publication/336832189_Positive_Health_Externalities_of_Mandating_Paid_Sick_Leave (also suggesting the health benefits of such laws increase over time as employees accumulate and take more paid sick days).

[26]      Elise Gold and Jessica Schieder, *Work Sick Or Lose Pay?*, Economic Policy Institute, June 28, 2017, https://www.epi.org/files/pdf/130245.pdf

[27]      LeaAnne DeRigne, Patricia Stoddard-Dare, and Linda Quinn, *Workers Without Paid Sick Leave Less Likely to Take Time Off For Illness Compared To Those With Paid Sick Leave*, Health Affairs, March 2016, https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2015.0965; *h*

have no choice but to continue working while sick to make ends meet.[28]

Recognizing this connection between paid sick time policies and public health, Massachusetts requires employers to provide their employees paid sick time. And, as the SJC has made clear in Somers and Depianti, in passing § 148B the legislature intended to ensure that workers in the Commonwealth receive basic employee protections that the legislature determined necessary. It is clear, then, that but-for Lyft's ongoing misclassification of its drivers in violation of § 148B, Lyft drivers like Plaintiffs would be granted these protections vital to maintaining their own well-being and public health.

Faced with the choice of staying home without pay and risking losing access to housing, food, and other necessities of living, Lyft drivers across Massachusetts will continue working and risk exposing hundreds of riders on a weekly basis to this deadly disease. Numerous health authorities, including the CDC, recognize that an essential component of mitigating the spread of such illnesses is the ability to self-quarantine and practice social distancing upon the onset of symptoms.[29] Such protective measures are key to "flattening the curve" of the rate of infection so as to avoid overwhelming available health care resources.[30] The availability of paid sick leave protections is essential to the success of such social distancing strategies. Indeed, studies have linked the dearth of paid sick leave policies in the United States with negative health outcomes

---

[28]     Todd Datz and Melissa Blair, *Poll: More Than Four In Ten Working Adults Think Their Work Impacts Their Health*, Harvard T.H. Chan School of Public Health, July 11, 2016, https://www.hsph.harvard.edu/news/press-releases/poll-more-than-four-in-ten-working-adults-think-their-work-impacts-their-health/ ; Amanda Mull, *The Problem With Telling Sick Workers To Stay Home*, The Atlantic, Feb. 28, 2020, https://www.theatlantic.com/health/archive/2020/02/coronavirus-could-hit-american-workers-especially-hard/607213/.

[29]     See Noreen Qualls et al., *Community mitigation Guidelines To Prevent Pandemic Influenza—United States, 2017*, Centers For Disease Control and Prevention, Apr. 21, 2017, https://www.cdc.gov/mmwr/volumes/66/rr/pdfs/rr6601.pdf.

[30]     Siobhan Roberts, *Flattening The Coronavirus Curve*, New York Times, March 11, 2020, https://www.nytimes.com/2020/03/11/science/coronavirus-curve-mitigation-infection.html ("The gentler curve ultimately results in fewer people infected and fewer deaths." The goal of measures such as social distancing is "to interfere with the natural flow of the outbreak.").

during the 2009–10 H1N1 outbreak.[31]  The American Public Health Association, for instance, estimates an additional 7 million people were infected and 1,500 deaths occurred during that outbreak because contagious employees did not (or could not) stay home from work to recover.[32]

Even though they are the workers most likely to lack—or, as here, be illegally denied— sick leave protections, Lyft drivers and other service workers are at higher risk of spreading such illnesses because they regularly come into contact with the general public in the course of their work.[33]  Evidence from countries affected by COVID-19 earlier than the United States suggests the number of individuals affected by COVID-19 is increasing exponentially.[34]  The health of Lyft drivers and the general public thus requires immediate injunctive relief to reduce the rate at which this deadly disease spreads by ensuring Lyft drivers have access to workplace protections that will realistically allow them to comply with essential public health directives.

There is no other way to construe this crisis, and Lyft's refusal to comply with the protections in place, then as a matter of public harm and a threat to public health.  As Plaintiffs made clear in their complaint: "[t]he injunction that Plaintiffs seek is in the nature of a public injunction and is not solely for the benefit of themselves and other Lyft drivers." Id. at ¶ 44.  As explained above, the implications of Lyft's misclassification scheme are far-reaching and cannot

---

[31]     Robert Drago and Kevin Miller, *Sick at Work: Infected Employees in the Workplace During the H1N1 Pandemic*, Institute For Women's Policy Research, Jan. 31, 2010. https://iwpr.org/publications/sick-at-work-infected-employees-in-the-workplace-during-the-h1n1-pandemic/.

[32]     *Support for Paid Sick Leave and Family Leave Policies*, American Public Health Association, Nov. 5, 2013. https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/16/11/05/support-for-paid-sick-leave-and-family-leave-policies.

[33]     Claire Cain Miller, Sarah Kliff and Margot Sanger-Katz, *Avoiding Coronavirus May Be a Luxury Some Workers Can't Afford*, New York Times, March 1, 2020 https://www.nytimes.com/2020/03/01/upshot/coronavirus-sick-days-service-workers.html; Alexis C. Madrigal, *The Gig Economy Has Never Been Tested by a Pandemic*, The Atlantic, Feb. 28, 2020 https://www.theatlantic.com/technology/archive/2020/02/coronavirus-gig-economy/607204/ (suggesting drivers "could become vectors spreading COVID-19 within cities and bringing it to outlying areas" because many gig-workers commute into wealthy urban centers where demand for such services is high, but where they cannot afford to live).

[34]     Yascha Mounk, *The Extraordinary Decisions Facing Italian Doctors: There are Now Simply Too Many Patients For Each One of Them to Receive Adequate Care*, The Atlantic, March 11, 2020. https://www.theatlantic.com/ideas/archive/2020/03/who-gets-hospital-bed/607807/.

be remedied later through an award of damages.

### C.     The Balance of Hardships Tips Sharply in Plaintiffs' Favor

Plaintiffs submit that the balance of hardships tips sharply in Plaintiffs' and the public's favor.  For this factor, the court considers "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld." Guilbert, 934 F.2d at 5.  Here, this factor weighs easily in favor of Plaintiffs.

Lyft is a massive international corporation, which recently received a $24 billion valuation in March of 2019.[35]  If Lyft is enjoined from classifying its drivers as independent contractors and required to provide paid sick days, any financial harm, immediate or otherwise, pales in comparison to that shouldered by its drivers, its passengers, and the general public.  For instance, issuing an injunction even absent concerns regarding COVID-19, the Superior Court of California for the County of San Diego found that the "balance of harms" resulting from Instacart's comparable misclassification scheme favored its "Shoppers" and the public as a result of the harms inflicted by the misclassification scheme.  See Ruling on Mot. For Preliminary Injunction, People of the State of California v. Maplebear, Inc., Case No. 2019-48731 (Ex. 1).[36]

Here, there is no question that any potential "harm" Lyft faces in being required to comply with existing employment standards is drastically outweighed by the public health risk posed by Lyft's ongoing refusal to properly classify and provide paid sick time to its drivers.[37]

---

[35]     Carl O'Donnell and Joshua Franklin, *Lyft Valued at $24.3 Billion in First Ride-Hailing IPO*, Reuters, March 28, 2019, https://www.reuters.com/article/us-lyft-ipo/lyft-valued-at-24-3-billion-in-first-ride-hailing-ipo-idUSKCN1R92P4 (last accessed Sept. 12, 2019).

[36]     Enforcement of the injunction was stayed, and Instacart's appeal is pending. See Notice of Appeal (Feb 27, 2020), People of the State of California v. Maplebear, Inc., (Cal. Sup. Ct. Sept. 13, 2019) Case No. 2019-48731

[37]     Indeed, Lyft has recognized that preventative measures in light of COVID-19 are necessary. Natasha Mascarenhas, *Lyft Is the Latest Tech Company to Send Employees Home Over Coronavirus*, TechCrunch, March 5, 2020. https://techcrunch.com/2020/03/05/lyft-is-the-latest-tech-company-to-send-employees-home-over-coronavirus/ (advising employees at its San-Francisco headquarters to work from home); *Lyft's Latest Info on Coronavirus*, Lyft Safety, https://www.lyft.com/safety/coronavirus#driver (last accessed March 12, 2020) (boasting of distributing more than two hundred thousand bottles of hand sanitizer and cleaning supplies to drivers).  Lyft has committed to providing funds to drivers diagnosed or put under quarantine by a public health agency.  However, this policy does not comply with Massachusetts Earned Sick

Besides, given the substantial likelihood of success Plaintiffs have on the merits of their misclassification claim, Lyft is almost certainly legally required to comply with Massachusetts's paid sick time law.  Lyft cannot, therefore, point to the "cost" of such compliance as a harm, particularly not in the face of a growing pandemic that heightens the harm of Lyft's misclassification scheme.

### D. An Injunction is in the Public Interest

Finally, enjoining Lyft's conduct is in the public interest. As discussed <u>supra</u>, the irreparable harm suffered by ***both*** the Plaintiffs and the public is enormous.  Were this Court not to enjoin Lyft's conduct, it would present a free pass to employers who are putting profits ahead of public health.  <u>See</u> <u>supra</u> n. 10.  The public harm presented here is enormous, such that it is hard to conceptualize.  Lyft **cannot** be given a free pass; Lyft drivers and the Commonwealth and the global public need the protections of the Massachusetts wage law.  The ongoing harm that the public, as well as Lyft drivers, will continue to suffer as a result of Lyft's misclassification will echo across the global and across generations – and cannot be remedied later.  For these reasons, the Court should grant Plaintiffs' request for an emergency preliminary injunction.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, this Court should immediately enjoin Lyft from misclassifying its drivers as independent contractors, rather than as employees, and henceforth comply with Massachusetts wage laws, including the Massachusetts Earned Sick Time Law.

Dated: March 16, 2020                          Respectfully submitted,

                                                                    MELODY CUNNINGHAM and
                                                                     FRUNWI MANCHO, on behalf of themselves
and all others similarly situated,

By their attorneys,

---

Time Law requirements, nor does it mitigate the spread of coronvirus, and as such it in no way mitigates the harm that Plaintiffs and the public will suffer in the absence of an injunction.

  /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, BBO# 640716
Adelaide H. Pagano, BBO# 690518
Anne Kramer, BBO# 697435
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:     (617) 994-5801
Emails: sliss@llrlaw.com; apagano@llrlaw.com;
akramer@llrlaw.com

### CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that on March 16, 2020, a copy of this document and all supporting documents referenced were served on all counsel for parties via ECF/electronic filing.

_____/s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO# 640716