# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MELODY CUNNINGHAM and
FRUNWI MANCHO, individually and on
behalf of all others similarly situated,

             Plaintiffs,

v.

LYFT, INC., LOGAN GREEN, and
JOHN ZIMMER,

             Defendants.

Case No. 1:19-cv-11974-IT

# PLAINTIFFS' EMERGENCY MOTION
## <u>FOR A PRELIMINARY INJUNCTION</u>

## I.    **INTRODUCTION**

Plaintiffs Melody Cunningham and Frunwi Mancho seek an emergency preliminary injunction enjoining Defendant Lyft, Inc. ("Lyft") from misclassifying its drivers as independent contractors when they are actually employees under Massachusetts law.  Because of this misclassification, Lyft is in particular violating the Massachusetts Earned Sick Leave Law, M.G.L. c. 149 § 148C, by failing to provide the drivers with paid sick leave – which will exacerbate the global health crisis of COVID-19 (the "coronavirus") and which requires immediate emergency redress.[1]

The urgency of enforcing § 148C under the unprecedented circumstances presented by the novel coronavirus is undeniable.  The Commonwealth has already declared a state of emergency due to the coronavirus[2], and earlier today, Governor Baker declared that a stay-at-home order will take effect in Massachusetts on Tuesday, March 24, 2020.[3]  As of this writing, Massachusetts has reported 777 confirmed cases of coronavirus and nine confirmed deaths.[4]  Public health institutions and executive officials across the county are ordering residents to stay home and go out only if essential.[5]  In particular, they have made clear that anyone who is feeling sick (regardless of whether they have been diagnosed with the coronavirus) should stay home and isolate themselves in order to prevent spread of the disease.[6]

---

[1]    On March 20, 2020, the Court granted Plaintiffs' emergency motion to file an amended complaint to add a claim for violation of M.G.L. c. 149 § 148C.  Dkt. 87.

[2]    Massachusetts Exec. Order No. 5891: Declaration of a State of Emergency to Respond to COVID-19 (March 10, 2020), available at https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19.

[3]    *Gov. Charlie Baker Issues Stay-At-Home Order*, WCVB, March 23, 2020, https://www.wcvb.com/article/gov-charlie-baker-issues-stay-at-home-order/31898661.

[4]    *Mass. Issues Stay-At-Home Advisory, Closes Non-Essential Businesses, As Death Toll Rises to 9,* Boston Globe (March 23, 2020), https://www.wcvb.com/article/massachusetts-covid-19-coronavirus-update-march-22-2020/31879392.

[5]    California, New York, and Illinois have issued state-wide shelter-in-place orders.

[6]    *What To Do if You Are Sick,* Center for Disease Control and Prevention (CDC), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html.

Lyft drivers, along with other "gig economy" workers, have continued to work during this crisis, as they have generally been recognized to be providing critical essential services.[7] Yet these drivers are being denied basic workplace protections due to Lyft's policy of misclassifying its drivers as independent contractors. Because Lyft does not classify its drivers as employees, Lyft does not even pretend to provide its drivers with paid sick leave as mandated by Massachusetts law. Thus, Lyft drivers who cannot afford to not work are being forced to continue driving *despite feeling sick* in order to earn an income and afford basic necessities. In the words of one Lyft driver, Mariah Mitchell:

> I can't self-quarantine because not working is not an option. If I don't make enough money, I can't feed my children for the next six weeks. I'm not stopping, fever or no fever. And that's what most other gig workers would do too, because none of us makes enough money to save up for an emergency like this.[8]

As described in the attached declaration, Massachusetts Lyft driver Martin El Koussa continued to drive for Lyft a week while feeling sick since the outbreak of the coronavirus pandemic. He explains that during that week, he "experienced body aches, a cough, and a sore throat" that may "be symptoms of coronavirus"; despite being instructed by his doctor to not even come into the doctor's office (in order to avoid infecting other patients), he explains that without paid sick leave, "I felt that I had no choice but to keep driving because I do not have any other way to make money." Declaration of Martin El Koussa (**Exhibit 1**) (El Koussa Decl.) ¶¶

---

[7]    Rideshare drivers, such as Lyft drivers, have been exempted from the Massachusetts stay-at-home order, as Gov. Bakers has indicated that "transportation" services are "essential" and will continue operating. Jaclyn Reiss, *A List of What Can Stay Open in Massachusetts*, The Boston Globe, March 23, 2020, https://www.bostonglobe.com/2020/03/23/metro/list-what-can-stay-open-during-bakers-stay-at-home-advisory/. Gig economy workers have generally been excluded from other states' shelter-in-place orders. See, e.g., Megan Rose Dickey, *San Francisco's Shelter-In-Place Order Does Not Apply to Gig Workers*, TechCrunch, March 16, 2020, https://techcrunch.com/2020/03/16/sf-shelter-in-place-gig-workers/.

[8]    Mariah Mitchell, *I Deliver Your Food, Don't I Deserve Basic Protections*, N.Y. Times, March 17, 2020, https://www.nytimes.com/2020/03/17/opinion/coronavirus-food-delivery-workers.html?referringSource=articleShare. See also Matthew Foresta, *Uber Is My Primary Source of Income. Each Time I Drive, I Risk Contracting Coronavirus*, USA Today, March 19, 2020, https://www.usatoday.com/story/opinion/voices/2020/03/19/uber-my-primary-income-each-time-drive-risk-contracting-covid-19-column/2866159001/ ("Driving is frequently my primary source of income. During those times, there is no way I can pay for essentials without putting my health, and the health of my riders, at risk.").

4, 8.[9]

Similarly, Massachusetts Lyft driver Vladimir Leodonis attests that he continued to drive for Lyft over the last few weeks, despite feeling so sick with coronavirus symptoms that he went to the emergency room (where he was denied a coronavirus test because he was only exhibiting some, and not all, the COVID-19 symptoms); Leodonis explains that he continued to drive for Lyft while sick because driving is his sole source of income and Lyft does not provide state-mandated paid sick leave that would have enabled him to afford to stop working. Declaration of Vladimir Leodonis (Leodonis Decl.) (**Exhibit 2**) ¶¶ 3-6, 8-9.[10]

As these declarations demonstrate, Lyft drivers may drive many passengers each day, including those who have been ordered to self-quarantine or who are coming from high-risk locations – and drivers and passengers are clearly not able to maintain the six-foot distance recommended by experts to prevent the rapid spread of the coronavirus. Lyft's misclassification policy is now, indisputably, endangering Lyft drivers, Lyft passengers, and the general public.

In short, Lyft drivers are facing an immediate threat of irreparable harm – contracting and infecting passengers with the coronavirus and contributing to the spread of the disease to the general public – due to Lyft denying its drivers state-mandated paid sick leave.[11]

---

[9]     Further, as he attests, driving for Lyft put him in a vulnerable position to contract the coronavirus, as his job requires him to "frequently pick up riders at the airport" and other high risk locations – including from the Biogen conference that recorded a high number of confirmed coronavirus infections – that he felt he could not decline without risking deactivation. Id. ¶¶ 5-6.

[10]     Leodonis (like El Koussa) suspects he was infected with the coronavirus from Lyft passengers, specifically from picking up a passenger from the Biogen conference or from other high risk locations (such as the airport or University of Massachusetts – Boston, where a student had a confirmed case of COVID-19). Id. ¶ 6. While Leodonis felt a social responsibility to stop driving in order to prevent the spread of the virus, he was simply unable to stop driving due to financial straits created by Lyft's lack of state-mandated paid sick leave (just as he was similarly unable to be selective about his passengers because he was afraid Lyft would deactivate his account if he rejected too many rides). Id. ¶¶ 6-10.

[11]     In recognition of the threat to public health as a result of employers denying paid sick leave during this pandemic, last week Congress passed emergency federal legislation to provide paid sick leave to some employees. See Emergency Paid Sick Leave Act, H.R. 6201 – 2, 116th Congress § 5101 (2020). However, the federal Act will not cover Lyft drivers if they are not

This Court should adjudicate this emergency motion forthwith and grant the motion for a preliminary injunction. On Friday, March 20, 2020, the Court denied Plaintiffs' earlier motion for preliminary injunction. Dkt. 88. Plaintiffs describe below why the instant motion should nevertheless be granted. First, Plaintiffs note that M.G.L. c. 149 § 150 permits them to seek injunctive relief on behalf of themselves and all others similarly situated – regardless of whether the injunction they seek qualifies as "public injunctive relief".[12] Second, Plaintiffs have met the standard for a preliminary injunction to issue pursuant to Fed. R. Civ. P. Rule 65. Indeed, the emergency presented by the current crisis creates much more stark grounds for an immediate order than were presented in Plaintiffs' prior request for preliminary injunction.

**First**, as Plaintiffs have previously briefed (and reincorporate here by reference), <u>see</u> Dkt. 4 at 12-16, Plaintiffs can easily show a likelihood of success on the merits of their misclassification claim, as Lyft will be unable to carry its burden under Prong B of the conjunctive, three-pronged "ABC" test that Massachusetts requires alleged employers to prove in order to justify independent contractor status for their workers. <u>See</u> M.G.L. c. 149 §

---

recognized as employees and because of the exemption for large employers. Liss-Riordan Decl. ¶ 2, 13. The state of emergency that led Congress to take this historic action only further confirms the need for immediate enforcement of any state law protections already in place.

[12]     The reason that Plaintiffs tried to explain in their earlier motion filed in September 2019, Dkt. 4, that the requested injunction qualified as public injunctive relief was so that they could obtain the injunction from this Court, notwithstanding Lyft's arbitration clause. <u>See</u> <u>id.</u> at 14-15. However, this Court has already determined that it would address Plaintiffs' Motion for Preliminary Injunction *prior to* addressing Lyft's motion to compel arbitration. <u>See</u> Dkt. 88 at 2 (stating that "the court still retains the power to grant interim relief, if otherwise justified, for the interval needed to resort to the arbitrator.") (citing <u>Next Step Med. Co. v. Johnson & Johnson Int'l.</u>, 619 F3d 67, 70 (1st Cir. 2010)); Tr. Hr'ing, March 16, 2020, at 17-19, 23. Thus, based on its conclusion that Plaintiffs' motion for preliminary injunction should be decided before Lyft's motion to compel arbitration, the Court need not even concern itself at this juncture with the question of whether Plaintiffs' request qualifies as public injunctive relief (and whether Massachusetts law would recognize this same exception to arbitration as California law). However, Plaintiffs reincorporate their argument from their previous motion for preliminary injunction, <u>see</u> Dkt. 4 at 14-16 (and set forth the argument briefly below as well) that their request for this injunction cannot be limited by Lyft's arbitration clause, in order to preserve this argument in the event that the Court of Appeals determines that Lyft's motion to compel arbitration would need to be considered before Plaintiffs' request for preliminary injunction.

148B(a)(2).[13]  As Plaintiffs can show likelihood of success on the merits of their

misclassification claim, it is a foregone conclusion that Plaintiffs can show the likelihood of

success of the merits of their paid sick leave claim brought under § 148C (as Lyft does not even

pretend to comply with this statute).[14]

**Second**, Plaintiffs can show irreparable harm to themselves and other Lyft drivers.

Lyft's ongoing refusal to acknowledge its drivers as employees, and thereby provide basic state-

mandated workplace protections including paid sick leave, poses an imminent, substantial risk of

harm to its drivers.  Drivers who are sick and stay home are not receiving state-mandated sick

pay that they are in desperate need of immediately.[15]  Further, faced with the choice of staying

---

[13]     See Somers v. Converged Access, Inc., 454 Mass. 582, 590-91 (2009) (alleged employer must prove all three prongs of the three-part test of § 148B in order for individual to be properly classified as an independent contractor).

[14]     Further, Plaintiffs also reincorporate their earlier argument that they can establish their likelihood of success in showing that Lyft's arbitration clause cannot thwart their attempt to obtain injunctive relief, Dkt. 4 at 14-15, both because the relief Plaintiffs seek is in the nature of "public injunctive relief" (and Massachusetts would adopt the rationale of McGill v. Citibank, N.A., 2.Cal.5th 945 (2017)), and because Lyft drivers are exempt from the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, as they fall within the transportation worker exemption to the FAA, see Singh v. Uber Techs., 2019 WL 4282185 (3rd Cir., Sept. 11, 2019) (rideshare drivers may fall under § 1 transportation worker exemption); Nieto v. Fresno Beverage Co., Inc., 33 Cal. App. 5th 274, 276-77 (2019) (delivery drivers fall under transportation worker exemption, despite only making intrastate deliveries); Waithaka v. Amazon, 2019 WL 3938053, at *2–4 (D. Mass., Aug. 20, 2019) (same); Rittman v. Amazon, 383 F. Supp. 3d 1196, 1201-02 (W.D. Wash. 2019) (same).  See further discussion infra at note 24.

[15]     Courts have recognized that employees' failure to receive pay that is due can comprise "irreparable injury" in extreme circumstances.  For example, in Aguilar v. BaineService Systems, Inc., 538 F. Supp. 581, 584 (S.D.N.Y. 1982), the court found a showing of irreparable harm under Rule 65 due to lost wages when the plaintiffs would lose their job and sole source of income in the absence of an injunction.  See also Roland Machinery Co. v. Dresser Industries, Inc., 749 F. 2d 380, 386 (7th Cir. 1984) (finding irreparable harm when plaintiff proved a damage award seriously deficient, as it "may come too late to save plaintiff's business. He may go broke while waiting, or may have to shut down his business"); Donohue v. Mangano, 886 F. Supp. 2d 126, 153-54 (E.D.N.Y. 2012) ("'For a poor man ... to lose part of his salary often means his family will go without the essentials.'") (quoting Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 342 n. 9, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (quoting statement of Congressman Gonzales, 114 Cong. Rec. 1833)).

This is one of those extreme circumstances, where Lyft drivers' failure to receive state-mandated sick pay will put them back into an unsafe situation if they have to continue working to make ends meet.  See, e.g., Leodonis Decl. ¶¶ 3, 8-9 (feeling forced to work despite sick, due to lack of paid sick leave and the fact that driving is his sole source of income on which he relies to support himself and his parents); El Koussa Decl.  ¶¶ 3, 7, 10 (also continuing to drive despite feeling sick because of financial necessity); see also Mitchell, supra note 8; Foresta, supra note 8.

home without pay and risking losing access to housing, food, and other necessities of living, Lyft drivers across Massachusetts will continue working and thus further expose themselves to dozens, or even hundreds, of riders on a weekly due to this deadly disease.[16]

**Third**, as to the balancing of harms, there can be no serious argument that helping prevent the spread of a global pandemic is outweighed by the cost to Lyft of coming into compliance with M.G.L. c. 149 § 148B, which predates Lyft's creation.[17] Lyft has simply

---

[16]     Plaintiffs submit that the irreparable injury prong is heightened by the fact that the public is subject to increased harm if an injunction does not issue, since Lyft drivers who are not receiving sick pay and cannot afford to stay home are continuing to work even if they are feeling sick and thus endangering the public. Although the Court has stated that it does not believe that Massachusetts law permits Plaintiffs to seek a "public injunction", Plaintiffs respectfully disagree (see infra at note 24) but also submit that the Court can take the risk of injury to the public into account in evaluating this prong of Rule 65. See, e.g., Holt v. Continental Group, Inc., 708 F. 2d 87, 91 (2d Cir. 1983) (instructing the district court to consider on remand whether the retaliatory discharge harmed public interest by deterring enforcement of Fair Labor Standards Act (by chilling employees from asserting their rights), such that it constituted irreparable injury under the second prong of Rule 65); Perez Gutierrez c. Mariscos El Puerto, Inc., 2019 WL 6050727, at *3 (D.Nev. Nov. 15, 2019) (citing Holt and weighing "strong public interest in favor of enforcement of the FLSA" in finding "allowing defendants to continue to flout the requirements of the FLSA will likely result in immediate and irreparable injury to plaintiffs, similarly situated employees, and the public interest" and therefore plaintiffs had meet their burden on the second prong of Rule 65(b)); Acosta v. RK Apparel, Inc., 2018 WL 1942400, at *3 (C.D. Cal. March 15, 2018) (weighing irreparable injury to "public interest in that any shipment of [] hot goods," produced under substandard labor standards, would result in unfair competition, in finding that plaintiffs had meet their burden on the second prong of Rule 65(b)). Further, the Court may consider the irreparable harm to government revenue (insofar as the government may need to foot the bill for drivers' unemployment during this crisis) under this prong. See, e.g., United States v. Bailey Family Chiropractic, 2018 WL 4271449, at *1 (W.D. Pa. Aug. 21, 2018) (finding irreparable injury to the government when employer failed to pay unemployment taxes).

        Moreover, in order to obtain an injunction, the strength of Plaintiffs' showing on the other Rule 65 prongs can overcome a weaker showing on one prong. Braintree Labs, Inc. v. Citigroup Global Markets, Inc., 622 F. 3d 36, 42-43 (1st Cir. 2010) (irreparable harm should be measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the show necessary on irreparable harm depends in part on the degree of likelihood of success shown."); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F. 3d 12 (1st Cir. 1996) (instructing that likelihood of success and irreparable harm must be weighed in tandem). Thus, if the Court is concerned about the strength of Plaintiffs' showing on this irreparable injury prong, the overwhelming strength of Plaintiffs' showing on the other prongs should alleviate this concern.

[17]     The current version of the "ABC test" has been the law in Massachusetts under M.G.L. c. 149 § 148B since 2004. See 2004 Mass. Legis. Serv. Ch. 193 (S.B. 2358) (WEST) (approved July 19, 2004). M.G.L. c. 149 § 148C in its current form was enacted in 2015.

ignored the laws of the Commonwealth and the applicability of M.G.L. c. 149 §§ 148B and 148C to its drivers, and the consequences of that choice are now being wrought in dire form.

**Fourth**, it is not in the public interest to allow Lyft to continue to misclassify its drivers and inflict public harm on its drivers, passengers, and the general public. Lyft should not be allowed to use litigation tactics to stall resolution and enforcement of §§ 148B and 148C no matter the consequences. Plaintiffs and the public simply cannot wait years, or even weeks, for Lyft to comply with Massachusetts' state-mandated paid sick leave law. In the interim, the rapid proliferation of the virus that occurs will be irreversible.

Moreover, the Court has the authority to and should grant this motion for a preliminary injunction at this stage in the litigation, prior to class certification. See infra Part III.B, at 18-20.

For the foregoing reasons, and as set forth further below, this Court should issue an emergency preliminary injunction enjoining Lyft from misclassifying its drivers, so that they will receive the protections of Massachusetts law, including state-mandated paid sick leave, so as to prevent irreparable harm to Lyft drivers and serve the immediate interests of the general public.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2019, Plaintiff Cunningham filed this class action complaint alleging that Lyft has misclassified its drivers as independent contractors, when they are employees under Massachusetts law and therefore entitled to employment protections under various provisions of the Massachusetts wage laws. See Compl. Dkt-1, at ¶2.

On September 23, 2019, Plaintiff moved for preliminary injunctive relief against Lyft for misclassifying Massachusetts drivers as independent contractors, based on the argument that Lyft has exacted an irreparable harm on drivers, as well as on the public generally and the Commonwealth of Massachusetts, by diminishing labor standards, depriving the state of tax revenue, and costing the state and taxpayers money in public assistance that is needed for Lyft drivers who cannot meet their basic needs due to their being deprived of their rights under the

Massachusetts wage laws. Dkt. 4. On October 3, 2019, Lyft filed a Motion to Compel Arbitration. See Dkts. 16-17. The Court heard oral argument on December 9, 2019.[18]

While those motions remained pending, on March 12, 2020, in light of the coronavirus pandemic, Plaintiffs submitted an emergency motion to amend their complaint in order to add a claim that Lyft has denied its drivers paid sick leave they are entitled to under M.G.L. c. 149 § 148C, see Dkt. 68, and a renewed motion for preliminary injunction based upon the pressing crisis, Dkt. 79. The Court held a telephonic conference on March 16, 2020. At the conference, the Court stated that it would deny Plaintiffs' earlier motion for preliminary injunction and would allow them to submit a new motion for preliminary injunction, assuming it allowed the motion to amend. Tr. Hr'ing March 16, 2020, at 29.[19]

On March 18, 2020, the Court granted Plaintiffs' motion to amend, Dkt. 87.[20] Plaintiffs now file this renewed motion for preliminary injunction.

---

[18] At the argument, the Court discussed whether Plaintiffs may need to show they crossed state lines in order to establish they fall under the transportation worker exemption to the FAA. Hr'ing Tr., Dec. 9, 2019, at 44-45. While Plaintiffs do not believe that the drivers themselves need to cross state lines to fall under this exemption, in order to address this concern and bolster their argument, they filed an Amended Complaint adding Plaintiff Mancho. See Dkt. 61.

[19] The Court then terminated Plaintiffs' new emergency motion for preliminary injunction, stating they could refile it after the Court ruled on the motion to amend. Tr. Hr'ing March 16, 2020, at 29. The Court issued its order denying the original motion for preliminary injunction on March 20, 2020, Dkt. 88.

[20] Plaintiffs have now filed their Second Amended Complaint. Dkt. 89. Plaintiffs plan to file a new motion to amend tomorrow, to add as named plaintiffs the two drivers who have submitted affidavits in support of this motion, Martin El Koussa and Vladimir Leodonis. At the telephonic status conference held on March 16, 2020, Lyft argued that Plaintiff Cunningham has not driven recently enough to be affected by Lyft's failure to provide Massachusetts sick leave pay during the coronavirus crisis. While Plaintiffs disagree that Plaintiff Cunningham would not have standing to pursue this claim, they attempted to submit a revised emergency motion to amend to add an additional named plaintiff in response to this argument raised by Lyft. Dkt. 79. The Court declined to allow Plaintiffs to substitute a new emergency motion to amend and ordered that Plaintiffs could file a new motion to amend that would be briefed and heard in the ordinary course, Dkt. 85, which Plaintiffs are now doing. Whether as named plaintiffs or class members, El Koussa and Leodonis have provided here evidence showing the harm to Lyft drivers (as well as the public) caused by Lyft's failure to provide paid sick leave to its drivers.

### III. ARGUMENT

#### A. The Court Should Grant Plaintiff's Motion for a Preliminary Injunction

This Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a) and (b). In order to prevail on a motion for a preliminary injunction, Plaintiffs must establish: (1) likelihood of success on merits; (2) that plaintiffs will suffer irreparable injury in absence of a preliminary injunction; (3) that such injury outweighs any harm to the defendants; and (4) that the injunction will not harm public interest. See Lanier Prof'l Serv., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999). As set forth below, Plaintiffs meet all these requirements.

#### 1. Plaintiffs Have Shown Likelihood of Success on the Merits

With respect to the merits, all that the Court must decide at this juncture is whether Plaintiffs have shown a _likelihood_ of success on the merits. There can be little question that Plaintiffs satisfy this requirement.

Indeed, Plaintiffs clearly have a likelihood of proving that they have been misclassified as independent contractors, since Lyft will be unable to carry its burden under Prong B of the conjunctive, three-prong "ABC" test: Lyft is a transportation company and its drivers provide transportation services. See Cotter v. Lyft, 60 F.Supp.3d 1067, 1069 (N.D. Cal. 2015) ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one"); see also O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1144 (N.D. Cal. 2015) ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business.").[21] Massachusetts courts regularly grant summary judgment

---

[21]     At the conference held on March 16, 2020, Lyft argued that it would not be in a position to address the merits of this case any time soon because the case raises a "complicated" analysis that would require an extensive showing, the submission of expert affidavits, etc. That is simply not the case. The entire point of Massachusetts rigid independent contractor law, M.G.L. c. 149 § 148B, is that it creates a bright line test, easing the analysis of the law. Indeed, California recently adopted the Massachusetts "ABC" test for determining employee status in order to simplify the analysis. See Dynamex Operations West Inc. v. Superior Court, 4 Cal.5th 903, 964 (2018) (adopting Massachusetts "ABC" test to "provide greater clarity and consistency, and less opportunity for manipulation, than a test or standard that invariably requires the consideration and weighing of a significant number of disparate factors on a case-by-case basis."). The "ABC" test was later codified by the California legislature in California Assembly Bill No. 5 ("AB 5"), which the California public and legislature understood to require that "gig economy" workers such as Lyft drivers would be recognized as employees. See, e.g., Kate Conger and Noam

on employee status based on an alleged employer's inability to carry its burden under Prong B.[22]

Even without the crisis of the coronavirus, a California Superior Court recently issued a

preliminary injunction against the "gig economy" company Instacart, finding the likelihood that

---

Scheiber, *California Bill Makes App-Based Companies Treat Workers as Employees*, N.Y. TIMES, Sept. 11, 2019 ("California legislators approved a landmark bill on Tuesday that requires **companies like** Uber and **Lyft** to treat contract workers as employees") (emphasis supplied). A.B. 5, which codified the Massachusetts ABC test adopted by Dynamex, has even been referred to as the "gig labor bill". Cheryl Miller, *Newsom Signs Landmark Gig Labor Bill, as Court Cases Loom*, THE RECORDER, Sept. 18, 2019, https://www.law.com/therecorder/2019/09/18/newsom-signs-landmark-gig-labor-bill-as-court-cases-loom/?slreturn=20200217185740; *Calif. Gov. Signs Worker Misclassification Bill Into Law*, LAW360, Sept. 18, 2019, http://law360.com/articles/1200449/calif-gov-signs-worker-misclassification-bill-into-law.

Thus, Lyft is incorrect that there is anything complicated or difficult about the Court determining whether Lyft drivers are employees under the "ABC" test. In any event, all the Court need to decide at this point is whether Plaintiffs can show a mere "likelihood of success" on the merits under this test.

[22] In doing so, courts frequently look to logic and commonsense in determining a defendant's usual course of business. See, e.g., Schwann v. FedEx Ground Package Sys., Inc., 2013 WL 3353776, *5 (D. Mass. July 3, 2013) (rejecting FedEx's attempt to characterize itself as a "logistics" company rather than a "delivery" company, and noting "[w]hether intended as shorthand for a more metaphysical purveyor of logistics business entity or not, FedEx advertises that it offers package pick-up and delivery services and its customers have no reason to believe otherwise"), aff'd in part rev'd in part on other grounds, 13 F.3d 429 (1st Cir. 2016); Awuah v. Coverall North Am., 707 F.Supp.2d 80 (D. Mass. 2010) (granting summary judgment to cleaning "franchisees" on misclassification under Prong B, rejecting defendant's contention that it was in the "franchising" business, rather than the cleaning business); Chaves v. King Arthur's Lounge, 2009 WL 3188948, *1 (Mass Super. July 30, 2009) (rejecting strip club's attempt to characterize itself as akin to a sports bar, rather than an adult entertainment business and granting summary judgment to exotic dancers under Prong B). The Appeals Court recently affirmed a trial court's grant of summary judgment to plaintiff newspaper delivery drivers on liability for misclassification, considering such factors as how the business holds itself out and whether the services provided by the plaintiffs are core to the business or merely incidental. See Carey v. Gatehouse, 92 Mass. App. Ct. 801, 807, 813–14 (2018).

For other cases in which Massachusetts courts have granted summary judgment in favor of plaintiffs on liability for misclassification, see also Oliveira v. Advanced Delivery Sys., Inc., 2010 WL 4071360 (Mass. Super. July 16, 2010) (delivery drivers); Amero v. Townsend Oil 2008 WL 5609064 (Mass. Super. Ct. Dec. 3, 2008) (oil delivery driver); Meier v. Mastec N. Am., Inc. Hampden C.A. No. 13-00488 (Mass. Super. April 8, 2015) (cable installers); Granite State Ins. Co. v. Truck Courier, Inc. 2014 WL 316670, *4 (Middlesex Super. Ct. Jan. 17, 2014) (truck couriers); Barbosa v. Kilnapp Enter., Inc. d/b/a Real Clean, Norfolk C.A. No. 2013-00266, *11-19 (Mass. Super. Ct. June 13, 2014) (auto detailers); Martins v. 3PD, Inc., 2013 WL 1320454 (D. Mass. Mar. 28, 2013) (delivery drivers); De Giovanni v. Jani-King Int'l, Inc. C.A. No. 07-10066 (D. Mass. June 6, 2012) ("franchisee" cleaning workers); Monteiro v. PJD Ent. of Worcester, Inc. d/b/a Centerfolds 29 Mass. L. Rptr. 202 (Mass. Super. Ct. Nov. 23, 2011) (exotic dancers); Jenks v. D & B Corp., d/b/a The Golden Banana, 28 Mass. L. Rptr. 579 (Mass. Super. Ct. Aug. 24, 2011) (exotic dancers); Fucci v. E. Connection Operating, Inc. C.A. No. 2008-2659, *9 (Mass. Super. Sept. 21, 2009) (delivery drivers).

its workers ("Shoppers") would be held to be employees under the "ABC" test.  See Ruling on

Mot. For Preliminary Injunction, People of the State of California v. Maplebear, Inc., Case No.

2019-48731, at *4 (Cal. Sup. Ct. Sept. 13, 2019) (**Exhibit 3**).

Furthermore, Plaintiffs have established a likelihood of success that Lyft has violated

M.G.L. § 148C, since Lyft does not even acknowledge its drivers to be employees entitled to the

benefits of the Massachusetts wage laws and is not even pretending to comply with this law, or

other Massachusetts wage laws, with respect to its drivers.[23]

Thus, Plaintiffs have established a likelihood of success on the merits.[24]

---

[23]     At the conference on March 16, 2020, Lyft said that it was providing pay for drivers
affected by the coronavirus crisis.  However, Lyft's recently issued policy does not comply with
§ 148C. *Lyft's Latest Info on Coronavirus*, Lyft, https://www.lyft.com/safety/coronavirus.  First,
Lyft has merely said that it will provide "funds" for drivers, without any specific information of
what funds would be made available. Id.  Second, in order to receive these funds, Lyft drivers
must first receive a COVID-19 diagnosis (or be put under individual quarantine by a public
health agency).  Massachusetts law, M.G.L. c. 149 § 148C does not require a coronavirus
diagnosis (or indeed *any* diagnosis or a quarantine order or even a doctor's note) in order for an
employee to begin receiving sick pay. See M.G.L. c. 149 § 148C; *Earned Sick Time in
Massachusetts Frequently Asked Questions*, Mass. AGO, Sept. 21, 2018, at *17,
https://www.mass.gov/files/documents/2018/09/21/est_faq_1.pdf.  Moreover, coronavirus tests
are in notably short supply, such that receiving an official diagnosis Lyft requires for this
"benefit" is out of reach for most drivers.  Public health recommendations advise anyone to stay
home *as soon as* they begin feeling sick, and Massachusetts law would allow employees to
receive sick pay as soon as they are feeling sick.

[24]     In opposing this motion, Lyft will attempt to rely on its arbitration clause, claiming that
the Court cannot grant any relief.  However, Lyft cannot thwart Plaintiffs from obtaining this
relief for two reasons, and again, at this juncture, the Court only needs to find that Plaintiffs are
*likely* to succeed on the merits of (at least one of) these arguments.  First, the relief Plaintiffs seek
is in the nature of a public injunction, and Plaintiffs submit that the Massachusetts Supreme
Judicial Court would follow the California Supreme Court in McGill v. Citibank, N.A., 2.Cal.5th
945, 962 (2017), which held that arbitration clauses cannot thwart a request for public injunctive
relief; and second, Lyft drivers fall under the transportation worker exemption to the Federal
Arbitration Act.

The Court has stated that it has the authority to address Plaintiffs' request for preliminary
injunction notwithstanding the arbitration clause, but Plaintiffs reiterate these arguments in order
to preserve these arguments, if necessary for appeal.  Plaintiffs thus reincorporate the arguments
they made in support of these two points from their earlier briefing and the oral argument held on
December 9, 2019.  See Dkts 4, 53.  Plaintiffs also state the following in response to the Court's
order of March 20, 2020, and its comments at the conference held on March 16, 2020.

First, the Court has stated that McGill was based on statutory language in California law
that does not exist in Massachusetts law.  However, the Court's conclusion that public injunctive
relief (i.e. request for an injunction that would benefit the public, not just the plaintiffs) cannot be
thwarted through an arbitration clause derives from court-made caselaw, namely the Court in
McGill itself.  In Massachusetts, only the SJC can say whether it would reach the same

conclusion under Massachusetts law.  Thus, Plaintiffs urge again that the Court consider certifying this critical issue to the SJC.

Furthermore, the statute at issue in McGill mirrors the statute Plaintiffs have brought their claims under here.  McGill concerned a claim brought under the UCL, Cal. Bus. & Prof. Code §§ 17203, 17353.  The UCL is similar to M.G.L. c. 149 § 150 in that it provides a private right of action for violations of the California Labor Code (which do or do not have their own private right of action), just as § 150 provides a private right of action for Massachusetts wage law violations.  Like the UCL, M.G.L. c. 149 § 150 allows an individual to "institute and prosecute … for himself and for others similarly situated, a civil action for injunctive relief…" Thus, § 150 mirrors the language of the UCL, which allows that "[a]ny person may pursue representative claims or relief on behalf of others."  Both statutes thus provide for an individual plaintiff to pursue class actions and injunctions extending relief to individuals beyond themselves.  Moreover, it has been widely recognized that the Massachusetts wage laws (like the consumer law at issue in McGill) are for the public good and not simply the good of the employees.  The SJC has made this clear repeatedly.  See, e.g., Somers v. Converged Access, Inc., 454 Mass. 582, 590-91 (2009) ("Misclassification *not only hurts the individual employee*; it also imposes significant financial burdens on the Federal government and the Commonwealth in lost tax and insurance revenues. Moreover, it gives an employer who misclassifies employees as independent contractors an unfair competitive advantage over employers who correctly classify their employees and bear the concomitant financial burden."); Depianti v. Jan-Pro Franchising Intern., Inc., 465 Mass. 607, 620-21 (2013) (quoting language from Somers); *An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, s. 148B, 2008/1*, AGO 1 ("The need for proper classification of individuals in the workplaces if of *paramount importance to the Commonwealth*") (emphasis added).

Second, in its recent order, Dkt. 88, the Court cited two decisions from California in which courts declined to apply the McGill exception to arbitration to Labor Code claims in which drivers sought to be declared employees so they would be entitled to unpaid wages.  See Colopy v. Uber Techs., Inc., 2019 WL 6841218 at *2 (N.D. Cal. Dec. 16, 2019); Magana v. DoorDash, Inc., 343 F.Supp. 3d 891, 901 (N.D. Cal. 2018).  However, in those two cases, the courts rejected the argument (as this Court did) based on their conclusion that plaintiffs' request for an injunction against their misclassification as independent contractors did not constitute a "public injunction" because their attempt to obtain their own wages and reimbursement primarily affected themselves and the harm to the public was too attenuated.  Magana, 343 F.Supp. 3d at 901 (referring to the public benefit as "derivate of and ancillary" to the benefit to employees); Colopy, 2019 WL 6841218 at *3 (quoting Magana and following its analysis).  Here, however, the connection between the plaintiffs' request for relief and the public good is far more clear; the harm to the public if injunctive relief is not issued here is far more stark.  Those rulings cannot stand for the more general proposition that workers seeking their rights under wage laws can never constitute a request for a public injunction.  Moreover, the Magana decision was appealed, see Magana v. DoorDash, Inc., Case No. 18-17232 (9th Cir.); that appeal has been placed on hold pending a proposed classwide settlement.  In a newly filed case based on the coronavirus pandemic that has been related to the Colopy case, Plaintiffs are seeking a renewed motion for injunctive relief, like they are here, based upon the emergency presented by the current emergency.

Finally, Plaintiffs note that paid sick leave, even more so than other wage rights, clearly have a "public purpose", since paid sick leave laws advance public health by enabling sick (and especially low wage workers) to stay home and not spread their illnesses to others.

## 2. Plaintiffs Have Shown That They (as Well as Lyft Drivers Generally) Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

Irreparable harm is typically found when there exists no adequate remedy at law. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). Here, the harm to Lyft drivers generally is starkly apparent. Drivers are forced to expose themselves to high-risk situations (such as picking people up from the airport) that could expose them to the coronavirus, in order to maintain good standing with Lyft, at the risk of contracting COVID-19. See El Koussa Decl. ¶ 6; Leodonis Decl. ¶¶ 6-7. Drivers are forced to continue working and driving despite being sick, and risk exposing dozens (perhaps hundreds) of passengers to the coronavirus, because they simply cannot afford to stay home due to lack of state-mandated sick leave. El Koussa Decl. ¶¶ 7-10; Leodonis Decl. ¶¶ 3, 9-10. Any argument Lyft may raise to downplay the risk of harm drastically underestimates (or simply ignores) guidance from experts and public health institutions that have determined the threat of coronavirus is very real, and concrete steps must be taken to prevent the spread of the virus.

Although Lyft may try to argue that its failure to pay wages that Plaintiffs contend they and class members are owed cannot constitute irreparable harm, courts have regularly found that defendants' failure to make payments that may impact plaintiffs' health can constitute irreparable harm, warranting the issuance of a preliminary injunction. See Harris v. Blue Cross Blue Shield of Missouri, 995 F. 2d 877, 878-79 (8th Cir. 1993) (finding irreparable harm when plaintiff was denied insurance coverage that could provide "the only possibility of long-term control or care" of plaintiffs' health); Boldon v. Humana Ins. Co., 466 F. Supp. 2d 1199, 1207-1208 (D. Ariz. 2006) (finding also that denial of insurance coverage constitutes irreparable harm when plaintiff faced liver-threatening liver cancer); B.E. v. Teeter, 2016 WL 3033500 at *5 (W.D. Wash. May 27, 2016) (finding that denial of Medicaid services constituted irreparable harm because it creates "(1) substantial risk to plaintiffs' health; (2) severe financial hardship; (3) inability to purchase life's necessities; and (4) anxiety associated with uncertainty") (quoting LaForest v. Former Clean Air Holding Co., Inc., 376 F. 3d 48, 55 (2d Cir. 2004)); International Schools

Services, Inc. v. AAUG Ins. Co., Ltd., 2010 WL 4810847, at *5 (S. D. Fla. Nov. 19, 2010) (finding irreparable harm to employees when health care insurer stopped covering payment of claims, leading to significant possibility that employees could be turned away from health care providers; "[t]he death of a child, the loss of a limb, or prolonged suffering due to lack of treatment cannot be undone by monetary means") (internal quotation marks and citation omitted); Sluiter v. Blue Cross Blue Shield of Mich., 979 F. Supp. 1131, 1145 (E.D. Mich. 1997) ("each plaintiff will suffer irreparable harm without this preliminary injunction because she will be unable to receive the course of treatment recommended by her physician").[25]

Similarly, courts have found irreparable harm when plaintiffs face dangerous working conditions. See, e.g., Dominion Energy Transmission, Inc. v. 0.11 Acres of Land, More or Less, in Doddridge Cty, W. Va., 2019 WL 4781872 at *5 (N.D. W. Va. Sept. 30, 2019) (threat to safety of employees working in close proximity to heavy machinery contributed to finding of irreparable harm (citing United Steelworkers of Am. AFL-CIO v. Blaw-Knox Foundry & Mill Mach. Inc., 319 F. Supp. 636, 641 (W.D. Pa. 1970) (finding threat to the health and safety of employees sufficient to justify the issuance of a preliminary injunction)). And, as discussed supra at p. 6, note 15, under extreme circumstances, failure to pay wages that impose hardships that extend beyond ordinary financial hardships may constitute irreparable harm under Rule 65.

Here, Plaintiffs will be unable to protect their health and will be subject to a life-threatening illness (or to becoming a "vector" of a life-threatening illness[26]) absent a preliminary injunction enjoining Lyft from violating M.G.L. c. 149 § 148C. Plaintiffs and other Lyft drivers will not only be unable to protect their own health, but also unable to protect the health of Lyft

---

[25]    Courts have found that preliminary injunctions are warranted under these circumstances even when the requested injunction will subvert the status quo. Id. at 1136 (although "an injunction is more commonly used to maintain the status quo rather than alter it," when Plaintiffs face "certain[] and grav[e]" irreparable harm "competing concerns" arise that justify a preliminary injunction); id. ("[t]he prevention of irreparable harm should outweigh re–establishment of the status quo in fashioning interlocutory relief....") (quoting Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir.1978)).

[26]    Alexis C. Madrigal, The Gig Economy Has Never Been Tested by a Pandemic, The Atlantic, Feb. 28, 2020 https://www.theatlantic.com/technology/archive/2020/02/coronavirus-gig-economy/607204/.

passengers and the general public, if Lyft continues to deny drivers state-mandated paid sick leave in violation of § 148C, as drivers will be forced to work in order to afford basic necessities.

There can be no question that enforcing employee protections already in place would increase safety for both Lyft drivers and the general public.  Even in ordinary circumstances, Lyft's failure to provide its drivers with the basic workplace protections they should have unacceptably increases the likelihood that its drivers and passengers will get sick and spread illnesses.  In the current crisis, denying workers these protections poses an intolerable risk to the health and safety of Lyft's drivers, as well as its customers and the public at large.

The connection between public health and the availability of basic employment protections like paid sick days and leave policies is well established.[27]  A recent study found that state-mandated access to paid sick leave policies reduced population-level flu infection rates by an average of eleven percent within the first year of the implementation of such laws.[28] Unsurprisingly, low-wage workers are the most likely to lack these basic workplace protections.[29]  Without the protections afforded by these and other workplace laws, workers like Lyft drivers are more likely to work while they are sick, increasing the likelihood they will

---

[27]    See, e.g., Supriya Kumar, John J., et al., *Policies to Reduce Influenza in the Workplace: Impact Assessments Using an Agent-Based Model*, American Journal of Public Health 103, no. 8 (Aug. 1, 2013): pp. 1406–1411, https://doi.org/10.2105/AJPH.2013.301269 (concluding that paid sick day policies reduce influenza transmission owing to presenteeism, and thus reduce the burden of influenza illness in workplaces).

[28]    Stefan Pichler, Katherine Wen & Nicolas Ziebarth, *Positive Health Externalities of Mandating Paid Sick Leave.* ResearchGate, Feb. 2020, https://www.researchgate.net/publication/336832189_Positive_Health_Externalities_of_Mandating_Paid_Sick_Leave. Studies have also linked the dearth of paid sick leave policies in the United States with negative health outcomes during the 2009–10 H1N1 outbreak. Robert Drago and Kevin Miller, *Sick at Work: Infected Employees in the Workplace During the H1N1 Pandemic*, Institute For Women's Policy Research, Jan. 31, 2010. https://iwpr.org/publications/sick-at-work-infected-employees-in-the-workplace-during-the-h1n1-pandemic/. The American Public Health Association estimates an additional 7 million people were infected and 1,500 deaths due to contagious employees who did not (or could not) stay home from work to recover. *Support for Paid Sick Leave and Family Leave Policies*, American Public Health Association, Nov. 5, 2013, https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/16/11/05/support-for-paid-sick-leave-and-family-leave-policies.

[29]    Elise Gold and Jessica Schieder, *Work Sick Or Lose Pay?*, Economic Policy Institute, June 28, 2017, https://www.epi.org/files/pdf/130245.pdf.

transmit illnesses among the general public, particularly because they regularly come into contact with the general public in the course of their work.[30]  Because they also lack the protection of other workplace protections like minimum wage and overtime laws, misclassified workers have no choice but to continue working while sick to make ends meet, and risk being infected with or infecting others with the coronavirus, as drivers and passengers cannot maintain a six-foot distance as recommended by public health authorities.

The irreparable harm presented by the advent of the coronavirus thus makes stark the harm wrought by Lyft's misclassification scheme – to both the Plaintiffs and the general public. In the context of a global pandemic, Lyft's ongoing refusal to provide basic workplace protections to its drivers poses an imminent, substantial risk of harm to its drivers and to the general public.  Faced with the choice of staying home without pay and risking losing access to housing, food, and other necessities of living, Lyft drivers across Massachusetts will continue working, subjecting themselves to grave danger, as well as risking exposing hundreds of riders on a weekly basis to this deadly disease and thus exacerbating this global emergency.

### 3.  The Balance of Hardships Tips Sharply in Plaintiffs' Favor.

Plaintiffs submit that the balance of hardships tips sharply in Plaintiffs' favor.  For this factor, the court considers "the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).  Here, this factor weighs easily in favor of Plaintiffs.

Lyft is a massive international corporation, which recently received a $24 billion valuation in March of 2019.[31]  If Lyft is enjoined from classifying its drivers as independent contractors and required to provide paid sick days, any financial harm, immediate or otherwise, pales in comparison to that shouldered by its drivers, its passengers, and the general public.  For instance, issuing a preliminary injunction even well before the current coronavirus pandemic

---

[30]      Id.

[31]      Carl O'Donnell and Joshua Franklin, *Lyft Valued at $24.3 Billion in First Ride-Hailing IPO*, Reuters, March 28, 2019, https://www.reuters.com/article/us-lyft-ipo/lyft-valued-at-24-3-billion-in-first-ride-hailing-ipo-idUSKCN1R92P4(last accessed Sept. 12, 2019).

(and before considering the defendant's motion to compel arbitration), a California Superior Court found that the "balance of harms" resulting from Instacart's similar misclassification scheme favored its "Shoppers" and the public. See Ruling on Mot. For Preliminary Injunction, Maplebear, Inc., Case No. 2019-48731, at*3-4 (Ex. 3), discussed supra p. 11. Here, there is no question that any potential "harm" Lyft faces in being required to comply with employment standards that predated Lyft's arrival in the Commonwealth is drastically outweighed by the public health risk posed by Lyft's ongoing refusal to properly classify and provide paid sick time to its drivers.

Given the substantial likelihood of success Plaintiffs have on the merits of their underlying misclassification claim (and thus on their paid sick leave claims), Lyft is almost certainly legally required to comply with Massachusetts's state-mandated paid sick time law and therefore cannot point to costs due to reclassification as a harm that should be weighed in the preliminary injunction analysis. See Id., at *4 (Ex. 3) (discounting any costs to Instacart in the preliminary injunction analysis, as the company had two years to come into compliance with the law and cannot now "claim surprise").

### 4. An Injunction Is in the Public Interest

Finally, enjoining Lyft's conduct is in the public interest. As discussed, the irreparable harm suffered by Lyft drivers, passengers, and the general public is enormous. The legislature has made a clear determination that paid sick time—in the manner it specified by statute—guarantees substantial benefits to workers and benefits public health. Lyft's ongoing noncompliance with that law poses a substantially greater harm to its drivers and to the general public. Lyft should not get to decide what level of compliance with workplace protections it deems sufficient to serve its employees and the public.

The Court should thus grant an immediate emergency preliminary injunction to require Lyft's compliance with these laws.

## B. This Court Has the Authority to Issue the Preliminary Injunction Requested

Lyft has argued that the Court has no power to issue a class-wide preliminary injunction prior to the certification of a class. See Dkt. 38, at 9-11; Tr. Hr'ing at 7. This contention is incorrect. A wealth of authority establishes that district courts in the First Circuit (and elsewhere) have the authority to issue preliminary injunctions enjoining harm to a putative class *prior* to class certification. See Martinez v. Rhode Island Housing and Mortg. Finance Corp., 738 F. 2d 21, 22, 36 (1st Cir. 1984) (affirming issuance of preliminary injunction in a putative class action); Devitri v. Cronen, 289 F. Supp. 3d 287, 289-290 (D. Mass. 2018) (district court granted preliminary injunction in putative class action without class certification).[32] Particularly

---

[32] See also LaForest v. Former Clean Air Holding Co., Inc., 376 F.3d 48, 55-58 (2nd Cir. 2004); Chhoeun v. Marin, 306 F. Supp. 3d 1147, 1164 (C.D. Cal. 2018) ("an injunction is necessary to forestall harm to putative class members that is likely to transpire before the parties can litigate a motion for class certification"); Hamama v. Adducci, 261 F. Supp. 3d 820, 840 n.13 (E.D. Mi. 2017) (preliminary injunction ordered prior to class certification noting that "the Sixth Circuit has held that 'there is nothing improper about a preliminary injunction preceding a ruling on class certification.'" (quoting Gooch v. Life Inv'rs Ins. Co. of Am., 672 F. 3d 402, 433 (6th Cir. 2012) vacated on other grounds, 912 F. 3d 869 (6th Cir. 2018)); Fish v. Kobach, 189 F. Supp. 3d 1107, 1147-1148 (D. Kan. 2016) ("case law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding the class certification motion"); Planned Parenthood of Kansas v. Mosier, 2016 WL 3597457, at *26 (D. Kan. July 5, 2016) aff'd in part, vacated in part sub nom. Planned Parenthood of Kansas v. Andersen, 882 F.3d 1205 (10th Cir. 2018) ("case law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding a class certification motion"); Rodriguez v. Providence Cmty. Corr., Inc., 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) (granting classwide injunctive relief, prior to certification of class, noting "'[a] district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers" (quoting Thomas v. Johnston, 557 F. Supp. 879, 917 (W.D.Tex.1983)); Lee v. Orr, 2013 WL 6490577 at *1 (N.D. Ill. 2013) ("District courts have the power to order injunctive relief covering potential class members prior to class certification. The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equity powers. The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons") (internal quotation marks and citations omitted); Lavan v. City of Los Angeles, 797 F. Supp. 2d 1005, 1019 (C. D. Cal. 2011) (granting a class-wide injunction prior to class certification); Brantley v. Maxwell–Jolly, 656 F.Supp.2d 1161, 1178 n. 14 (N.D. Cal. 2009) ("[d]istrict courts are empowered to grant preliminary injunctions 'regardless of whether the class has been certified.'") (citing Schwarzer, Tashima and Wagstaffe, *Federal Civil Procedure Before Trial,* § 10:773 at 10–116 (TRG 2008)) V.L. v. Wagner, 669 F. Supp. 2d 1106 (N.D. Cal. 2009) (also issuing preliminary injunction in putative class action); National Organization for Reform of Marijuana Laws (NORML) v. Mullen, 608 F. Supp. 945, 963-964 (N.D. Cal. 1985) (same).

when a putative class collectively faces urgent or life-threatening harm, courts have issued preliminary injunctions enjoining harm to the putative class, regardless of whether a motion for class certification has been brought or even considered. See, e.g., Coalition for Basic Human Needs v. King, 654 F. 2d 838, 843 n.2 (1st Cir. 1981) (affirming injunctive relief prior to class certification, "[w]here the need for class-wide relief is so clear and compelling and where time is of such urgency"); Doe v. Trump, 2019 WL 6324560, at *22 (D. Or., Nov. 26, 2019) (issuing preliminary injunction in putative class action when family members visas would be (at a minimum) delayed, as it would constitute extreme hardship on family members to be separated); B.E. v. Teeter, 2016 WL 3033500 at *1 (W.D. Wash. May 27, 2016) (issuing a preliminary injunction before addressing pending motion for class certification).[33]

The Court's authority to issue a class-wide injunction is even more pronounced when the individual plaintiffs seek relief that is inevitably identical to that which would be provided to the class, for example, when relief demands a change in policy that will inevitably offer relief to

---

[33]     Lyft has claimed that Brown v. Trustees of Bos. Univ., 891 F.2d 337 (1st Cir. 1989), prevents this Court from issuing a classwide preliminary injunction prior to the certification of a class. However, this decision does not stand for any broad proposition that the First Circuit prohibits district courts from issuing preliminary injunctions in putative class action cases prior to certification. At least one district court in the First Circuit has approved preliminary injunctions providing relief to putative class members since Brown was decided. See Devitri v. Cronen, 289 F. Supp. 3d 287, 289-290 (D. Mass. 2018). Besides, the decision in Brown was based on its facts, not a broad prohibition on class-wide preliminary injunctions prior to class certification. In Brown, a professor sought an injunction enjoining her employer from "discriminating on the basis of sex with respect to the appointment, promotion and tenure of faculty members." Id. at 361 (quoting the lower court's order). That injunction was overturned as overbroad because "there is no such reason here for an injunction running to the benefit of nonparties. [Plaintiff's] case established that she alone had been the victim of sex discrimination." Id. (emphasis supplied). In contrast, it is clear that Lyft is not even attempting to comply with Massachusetts sick pay law, and thus the violation Plaintiffs seek to remedy is one that affects all Lyft drivers. In discrimination cases (other than disparate impact cases), it is far from clear at the outset of a case whether alleged discrimination goes beyond the plaintiffs. That is not the case with a wage case in which plaintiffs are challenging an employer's policy. Here, Lyft is uniformly denying its drivers state-mandated sick leave, and thus putative class members are victims of the same deprivation of employee protections as Plaintiffs. In order to prevent irreparable harm to the putative class (as well as the public as a whole), the Court must enter a class-wide injunction.

putative class members. See Just Film, Inc. v. Merchant Services, Inc., 474 Fed. Appx. 493, 495 (9th Cir. 2012) (affirming issuance of preliminary injunction in putative class action, in part because "plaintiff has shown that a class-wide injunction is necessary to remedy the alleged class-wide harm"); Price v. City of Stockton, 390 F.3d 1105, 1117-18 (9th Cir. 2004) (affirming issuance and scope of preliminary injunction).[34]

## IV. CONCLUSION

For the foregoing reasons, this Court should enjoin Lyft from misclassifying its drivers as independent contractors, thus entitling them to the protections of Massachusetts wage laws, including paid sick leave. Doing so immediately is essential to avoiding imminent harm to Lyft drivers, as well as the general public.

---

[34] While Lyft may argue that not every Lyft driver in Massachusetts will need to take sick leave, and thus not every driver is harmed by Lyft's alleged violation of M.G.L. c. 149 § 148C, a classwide injunction is required in order to ensure that Lyft will abide by the law with respect to any drivers in Massachusetts who may need it. Even in deciding class certification, courts have not required every member of a class to actually be harmed by the alleged violation. See In re Nexium Antitrust Litig., 777 F.3d 9, 32 (1st Cir. 2015); Messner v. Northshore University HealthSystem, 669 F. 3d 802, 825 (7th Cir. 2012) (once plaintiffs had shown broad antitrust impact, certification could not be denied just because defendants pointed to a class of uninjured members); Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 14, 120 N.E.3d 690, 702 (2019) ("possibility that a well-defined class will nonetheless encompass some class members who have suffered no injury" is "generally unproblematic") (citing 1 Newberg on Class Actions, at § 2:3 (Supp. 2018)); Frank v. Gold'n Plump Poultry, Inc., 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007) (holding that some employees having no damages did not detract from the point that defendant maintained a uniform corporate policy that plaintiffs alleged violated the law); see also In re Whirlpool Corp. Front–Loading Washer Products Liability Litig., 722 F.3d 838, 854–55 (6th Cir.2013) (where defendants contended that class included owners who are "pleased with the performance of their" machines and are thus dissimilar to consumers who complained of a mold problem, court held that commonality was not defeated where plaintiffs showed washer models were nearly identical).

Dated: March 23, 2020

Respectfully submitted,

MELODY CUNNINGHAM and
FRUNWI MANCHO, individually and on behalf of
all others similarly situated,

By their attorneys,

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, BBO# 640716
Adelaide H. Pagano, BBO# 690518
Anne Kramer, BBO# 697435
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Facsimile: (617) 994-5801
Emails: sliss@llrlaw.com; apagano@llrlaw.com;
akramer@llrlaw.com

## CERTIFICATE OF CONFERENCE

I, Shannon Liss-Riordan, hereby certify that I conferred with counsel for Defendants regarding the subject matter of this motion and was informed that Defendants oppose the relief sought in this motion.

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, Esq.

## CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, hereby certify that a copy of this document was delivered on March 23, 2020, via electronic filing CM/ECF system to counsel for Defendants.

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, Esq.