UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MELODY CUNNINGHAM, | * | |
| FRUNWI MANCHO, | * | |
| MARTIN EL KOUSSA, and VLADIMIR | * | |
| LEONIDAS, individually | * | |
| and on behalf of all others similarly | * | |
| situated, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 1:19-cv-11974-IT |
| v. | * | |
| | * | |
| LYFT, INC., LOGAN GREEN, and | * | |
| JOHN ZIMMER, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

May 22, 2020

TALWANI, D.J.

      This putative class action, brought by Plaintiffs Melody Cunningham, Frunwi Mancho, Martin El Koussa, and Vladimir Leonidas, on their own behalf and on behalf of similarly situated individuals in Massachusetts who drive for Defendant Lyft, Inc. ("Lyft"), seeks a declaratory judgment under the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., and asserts claims of misclassification as independent contractors under M.G.L. c. 149, § 148B, and for expense reimbursement, minimum wages, overtime and earned sick time under M.G.L. c. 149, §§ 148, 148B, 148C, and M.G.L. c. 151, §§ 1, 1A. Defendants moved to compel individual arbitration of Plaintiffs' claims, and when the court denied that motion, Defendants filed an interlocutory appeal. Now before the court is Plaintiffs' <u>Emergency Motion for a Preliminary Injunction</u> [#90] and Defendants' <u>Emergency Motion to Confirm Stay Pending Appeal</u> [#107].

Defendants assert that, upon Defendants' filing of their Notice of Appeal [#102], the court was divested of jurisdiction to act on any aspect of the case. Because the court is divested of jurisdiction to act on those aspects of the case involved in the appeal but is not precluded from issuing preliminary injunctive relief to preserve the status quo, Defendants' motion to stay is GRANTED as to their obligation to file an Answer and as to discovery, but is DENIED as to consideration of Plaintiffs' motion for injunctive relief.

Plaintiffs' motion seeks, in light of the extraordinary circumstances caused by the COVID-19 pandemic, an emergency preliminary injunction enjoining Lyft from misclassifying its drivers as independent contractors. Although Plaintiffs have a substantial likelihood of success on the merits of the underlying misclassification claim, the balance of equities weigh in Plaintiffs' favor, and the requested injunction would support rather than harm the public interest, the motion for preliminary injunction is DENIED as Plaintiffs have not shown irreparable harm.

I.    Procedural History

Plaintiff Melody Cunningham filed this action, on her own behalf and on behalf of similarly situated Lyft drivers in Massachusetts, alleging misclassification and non-payment of minimum wages and overtime by Lyft and its Chief Executive Officer Logan Green and President John Zimmer. Compl. [#1].[1] The complaint has been amended twice, adding Plaintiffs Frunwi Mancho, Martin El Koussa and Vladimir Leonidas, and a claim for paid sick time. Am. Compl. [#61]; Third Am. Compl. [#147].

---

[1] Cunningham also filed a Motion for Injunctive Relief [#4] (the "Motion for Public Injunction") to enjoin Defendants' alleged misclassification of drivers, which the court has denied. Memorandum and Order [#88]. Plaintiffs have appealed the denial of the motion for public injunction. Notice of Appeal [#119].

Defendants responded with a <u>Motion to Compel Arbitration and Stay Proceedings Pending Arbitration</u> ("Motion to Compel Arbitration") [#16], asserting that Plaintiffs were bound to individually arbitrate their claims.[2] While Defendants' motion was pending, the global COVID-19 pandemic arose. In light of the pandemic, Plaintiffs filed the pending <u>Emergency Motion for a Preliminary Injunction</u> [#90], asserting that Lyft's failure to provide drivers with paid sick time required emergency redress.

The court denied Defendants' Motion to Compel Arbitration before addressing Plaintiffs' <u>Emergency Motion</u> [#90]. Mem. & Order [#98]. Defendants immediately appealed, see <u>Notice of Appeal</u> [#102], and filed the pending <u>Emergency Motion to Stay</u> [#107].[3]

II.     <u>Defendants' Emergency Motion to Stay [#107]</u>

Under Section 16(a) of the Federal Arbitration Act ("FAA"), a party may pursue an immediate interlocutory appeal of a district court's denial of a motion to compel arbitration. 9 U.S.C. § 16(a). Defendants have filed such an appeal. They argue that as a result, the court lacks jurisdiction "over the entire case," and must automatically stay all proceedings pending appeal. Defs' Mot. to Stay 1, 3 [#107].

---

[2] Defendants' motion to compel arbitration was filed prior to Plaintiffs' filing the <u>Amended Complaint</u> [#61]. The parties agreed to the court applying Defendants' motion to compel arbitration and the parties' briefing to the <u>Amended Complaint</u>. Stipulation [#64]. The <u>Third Amended Complaint</u> [#147] was filed after the court ruled on Defendants' motion to compel. In accordance with the parties' <u>Joint Motion Related to Plaintiffs' Third Amended Complaint</u> [#142], made without prejudice to either sides' arguments regarding a stay pending appeal or Defendants' ability to challenge the court's denial of their motion to compel arbitration, the court has extended the ruling on the motion to dismiss to the <u>Third Amended Complaint</u> [#147]. <u>See</u> Order [#173].

[3] Defendants' motion also requested a brief extension of time to respond to Plaintiffs' <u>Emergency Motion for a Preliminary Injunction</u> [#90] and a telephonic status conference. The court granted these requests. Elec. Order [#111].

"The filing of a notice of appeal is an event of jurisdictional significance," which "confers jurisdiction on the court of appeals and divests the district court of its control <u>over those aspects of the case involved in the appeal.</u>" <u>Griggs v. Provident Consumer Disc. Co.</u>, 459 U.S. 56, 58 (1982) (emphasis added). Thus, "[a]n interlocutory appeal ordinarily suspends the power of the district court to modify the order subject to appeal, but does not oust district-court jurisdiction to continue with proceedings that do not threaten either the appeal's orderly disposition or its raison d'etre." 16A Charles A. Wright et al., <u>Federal Practice & Procedure</u> § 3949.1 (5th ed. 2016); <u>see, e.g.</u>, <u>Marrese v. Am. Acad. of Orthopaedic Surgeons</u>, 470 U.S. 373, 378-9 (1985) (finding that during appeal of criminal contempt judgment based on noncompliance with a discovery order, district court retained power to modify earlier denial of motion to dismiss so as to certify the denial for interlocutory appeal where motion to dismiss was not involved in appeal and amendment did not "interfere with but instead facilitated review of the pending appeal . . . ."); <u>United States v. Brooks</u>, 145 F.3d 446, 455 (1st Cir. 1998) ("as a general rule, the filing of a notice of appeal 'divests a district court of authority to proceed with respect to any matter touching upon, or involved in, the appeal.'") (quoting <u>United States v. Mala</u>, 7 F.3d 1058, 1061 (1st Cir. 1993)).

Defendants argue that the court should follow the "majority rule" from other circuits staying cases during appeals in FAA cases. Defs' Mot. to Stay 4-5 [#107] (citing <u>Levin v. Alms & Assocs., Inc.</u>, 634 F.3d 260, 264-66 (4th Cir. 2011); <u>McCauley v. Halliburton Energy Servs., Inc.</u>, 413 F.3d 1158, 1160-62 (10th Cir. 2005); <u>Blinco v. Green Tree Servicing, LLC</u>, 366 F.3d 1249, 1251-52 (11th Cir. 2004); <u>Bombardier Corp. v. Nat'l R.R. Passenger Corp.</u>, 333 F.3d 250, 252 (D.C. Cir. 2003); <u>Bradford-Scott Data Corp., Inc. v. Physician Comput. Network, Inc.</u>, 128 F.3d 504, 506 (7th Cir. 1997)). None of these cases, however, addresses a motion for preliminary

injunction. And several reiterate the Supreme Court's guidance that district courts retain

jurisdiction over matters not involved in the appeal. See e.g., McCauley, 413 F.3d at 1161

("[w]hen an interlocutory appeal is taken, the district court only retains jurisdiction to proceed

with matters not involved in that appeal.") (quoting Stewart v. Donges, 915 F.2d 572, 575-76

(10th Cir. 1990), which in turn quoted Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th

Cir. 1987)); Bradford-Scott, 128 F.3d at 505 (stating "[t]he qualification 'involved in the appeal'

is essential" and listing various collateral issues district courts retain control over after appeal has

been filed) (quoting Griggs, 459 U.S. at 58).

The court therefore considers the various matters presently before the court to determine

whether the matter raised is "involved in the appeal."

A.  Defendants' Emergency Motion to Stay

As a threshold matter, neither side disputes this court's jurisdiction to consider

Defendants' Emergency Motion to Stay [#107]. Under Rule 8 of the Federal Rules of Appellate

Procedure, "[a] party must ordinarily move first in the district court" for certain relief, including

"a stay of the . . . order of a district court pending appeal." Fed. R. App. P. 8(a)(1)(A).

Defendants' Motion to Stay, properly filed first in this court, implicitly recognizes the court's

jurisdiction to act on that motion, and the court proceeds to do so.

B.  Plaintiffs' Emergency Motion for a Preliminary Injunction

Rule 8 similarly requires that a party "must ordinarily move first in the district court for .

. . an order . . . granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C).

Defendants' contention that the court may not consider Plaintiffs' Emergency Motion for a

Preliminary Injunction [#90] ignores this requirement.

In Teradyne, Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir. 1986), the First Circuit carefully

considered the effect of the FAA on a district court's power to grant preliminary injunctive relief.

In that case, the district court had not yet determined whether the dispute was arbitrable when it granted a motion for a preliminary injunction. The First Circuit posited that if "the policy of the Arbitration Act precludes the grant of preliminary injunctive relief in an arbitrable dispute," the district court's grant of injunctive relief prior to deciding the arbitrability question was an abuse of discretion. Id. at 47. However, if the "Arbitration Act poses no bar to the grant of a preliminary injunction, then whether or not the dispute is arbitrable is irrelevant." Id. (emphasis added).

The First Circuit noted that three other circuits had examined the issue in detail and had concluded that "a court can, and should, grant injunctive relief in an arbitrable dispute pending arbitration." Id.[4] The First Circuit rejected contrary authority from the Eight Circuit and embraced the approach taken by the Second, Fourth and Seventh Circuits, concluding that "the congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." Id. at 51.

---

[4] The court considered Second Circuit precedent, stating "the Second Circuit held that the fact that the dispute was to be arbitrated did not absolve the court of its obligation to consider the merits of a requested preliminary injunction, that the proper course for the district court was to determine whether the dispute was a "proper case" for an injunction, id. at 47 (quoting Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N. Y., Inc., 749 F.2d 124, 125 (2d Cir. 1984), and that "the injunction was the only way to preserve the status quo during the pendency of the arbitration proceeding." Id. (citing Erving v. Va. Squires Basketball Club, 468 F.2d 1064, 1067 (2d Cir. 1972)).

The court also noted "[t]he Fourth Circuit [held] that nothing in § 3 [of the FAA] abrogated the equitable power of district courts to enter preliminary injunctions to preserve the status quo pending arbitration [and that t]he court also stated that it thought its decision would further rather than frustrate the policies underlying the Arbitration Act by ensuring that the dispute resolution would be a meaningful process." Id. at 47-48 (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1052, 1054 (4th Cir. 1985)). Finally, the court noted the Seventh Circuit "held that the right to arbitrate and to seek injunctive relief were not incompatible." Id. at 48 (citing Sauer Getriebe KG v. White Hydraulics, Inc., 715 F.2d 348, 350 (7th Cir. 1983)).

The First Circuit's rationale in <u>Teradyne</u> undermines Defendants' contention that this court may not consider Plaintiffs' motion for a preliminary injunction while Defendants appeal the order denying their motion to compel arbitration. Under <u>Teradyne</u>, a district court may exercise its traditional equitable powers to grant preliminary injunctive relief even while arbitrability is unsettled because whether the dispute is arbitrable is irrelevant to the pending preliminary injunction. If the court has authority to consider a motion for preliminary relief before addressing the motion to compel arbitration, it certainly has authority to consider that same motion after denying the motion to compel arbitration, despite Defendants' appeal. Defendants' response that Plaintiffs do not seek to preserve the status quo pending arbitration but seek "a wholesale makeover" of Lyft's business, <u>Defs' Mot. to Stay</u> 13 [#107], goes to the merits of that motion, and not the court's power to consider it.

Defendants argue that <u>Optum, Inc. v. Smith</u>, 366 F. Supp. 3d 156, 159-60 (D. Mass. 2019) ("<u>Optum II</u>") counsels for a different outcome. The court disagrees. In <u>Optum, Inc. v. Smith</u>, 360 F. Supp. 3d 52, 56 (D. Mass. 2019) ("<u>Optum I</u>"), the court determined it had authority to decide whether the requested temporary restraining order ("TRO") was justified to preserve the status quo before issuing an order compelling arbitration based on "the nearly uniform views of the Courts of Appeal that have addressed this issue." 360 F. Supp. 3d at 56 (citing <u>Teradyne</u>, 797 F.2d at 51). Based on this finding, the court denied the motion to compel without prejudice to the issuance of an order compelling arbitration after the motion for a TRO was decided. It was this order that was on appeal when the court granted a stay in <u>Optum II</u>. In doing so, the court specifically noted the First Circuit "might find that the pending motion for a TRO is an 'aspect[] of the case involved in the appeal.'" <u>Optum II</u>, 366 F. Supp. 3d at 160. In

contrast, Defendants' appeal here concerns only whether arbitration must be compelled and not whether the court may assert jurisdiction over Plaintiffs' motion for preliminary injunctive relief.

Finally, Defendants argue that even if the court determines that it is not barred from asserting jurisdiction by an "automatic" stay, the court should nonetheless decline to consider Plaintiffs' motion and grant a discretionary stay pursuant to Hilton v. Braunskill, 481 U.S. 770, 776-77 (1987). A court may grant a discretionary stay based on weighing four factors: (1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies. Acevedo-Garcia v. Vera-Monroig, 296 F.3d 13, 16 n.3 (1st Cir. 2002) (citing Hilton, 481 U.S. at 776-77). "[T]he first two factors" are "the most critical." Nken v. Holder, 556 U.S. 418, 434 (2009).

The first factor does not require the movant to convince the court that it was wrong on the decision now under appeal, but instead to show that the appeal raises "serious and difficult questions of law." Reaves v. Dep't of Corr., 404 F. Supp. 3d 520, 522 (D. Mass. 2019). The Defendants have made this showing.

However, Defendants have not shown how the court's consideration of Plaintiffs' motion for a preliminary injunction will cause them irreparable harm. As noted above, Fed. R. App. P. 8 generally requires movants to bring motions for preliminary injunction in the district court before bringing such motions in the appellate court. This procedural requirement undermines the notion that Defendants will be irreparably harmed by the court's consideration of Plaintiffs' motion. In addition, while Defendants argue they face irreparable harm if the court issues a preliminary injunction that will "profoundly disrupt Lyft's and its drivers' expectations" of bilateral arbitration rather than class proceedings, Defs' Mot. to Stay 11 [#107], Defendants speak only to

the specifics of Plaintiffs' proposed injunctive relief, not to the threshold question of the court's ability to consider Plaintiffs' motion. And as to any relief the court may offer, Defendants may immediately appeal the grant of injunctive relief. Morales Feliciano v. Rullan, 303 F.3d 1, 6 (1st Cir. 2002) (quoting 28 U.S.C. § 1292(a)(1)).

In comparison, Plaintiffs were the prevailing party on the motion to compel arbitration and have asserted exigent circumstances necessitating a preliminary injunction to prevent irreparable harm due to the COVID-19 pandemic. As noted above, addressing the matter now does not interfere with the First Circuit's review of the arbitrability appeal.

Finally, considerations of judicial economy suggest any stay should not preclude this court's consideration of Plaintiffs' pending motion. If the court accepts Defendants' argument and stays consideration of the motion, Plaintiffs will likely file a motion with the First Circuit to lift the stay so as to send the preliminary injunction motion back to the district court to decide, or alternatively burden the First Circuit with considering a motion for equitable relief in the first instance. In either event, the First Circuit will be faced with questions unrelated to the arbitrability appeal that may be better addressed first by the district court. If the court rejects the stay Defendants seek and considers the motion for a preliminary injunction, either side may appeal the court's decision and the First Circuit will be able to receive a consolidated record to facilitate a more complete appellate review.

C. Answer and Discovery

In the absence of a stay, Defendants would be required to answer the complaint and the parties would engage in discovery. See Fed. Rs. Civ. P. 12, 16, and 26. In Lummus Co. v. Commonwealth Oil Ref. Co., a case that predated § 16(a) of the FAA, the First Circuit stayed discovery pending resolution of an arbitrability appeal. 273 F.2d 613, 613-14 (1st Cir. 1959).

The First Circuit explained that "a court order of discovery would be affirmatively inimical to appellee's obligation to arbitrate" and that "if arbitration is to be had of the entire dispute, appellee's right to discovery must be far more restricted than if the case remains in a federal court for plenary trial . . . ." Id. at 613. The court determined a stay of discovery was appropriate because, "[u]ntil it is determined whether this action has been properly brought, appellee should not receive unnecessary fruits thereof." Id. at 614. Plaintiffs have made no argument that a stay of discovery or of Defendants' obligation to answer the complaint should not similarly apply here. Accordingly, following Lummus Co., the court stays this action as to Defendants' obligation to answer the complaint and as to discovery.

III.   Plaintiffs' Emergency Motion for a Preliminary Injunction [#90]

Plaintiffs ask the court to enjoin Lyft from misclassifying its drivers as independent contractors, thus entitling them to the protections of Massachusetts wage laws, including paid sick time. Because Plaintiffs' motion was filed as an emergency motion based on the current health crisis, and because the court has previously considered and denied Plaintiffs' motion for broader relief, the court treats this emergency motion as seeking classification of drivers as employees for purposes of paid sick time only.

A.   Background

1.   Lyft, Inc., and Drivers

Lyft is a company that enables riders to obtain transportation to certain destinations. Ayanbule Decl. ¶ 2 [#18]. Riders arrange a ride through Lyft's mobile phone application ("App") and indicate where they want a driver to pick them up. Sholley Decl. ¶ 5 [#132]. Lyft offers the

ride to available drivers in the same geographic area and a driver accepts the ride through the App. Id. ¶¶ 5, 7.

To drive for Lyft, a potential driver must agree to Lyft's Terms of Service (the "Terms"). Terms 1 [#18-1]. In agreeing to the Terms, the driver affirms that, among other requirements, he or she owns, or has the legal right to operate the vehicle in which the driver will transport customers. Id. § 10(b). A potential driver must also pass Lyft's driver screening, which includes a driving history and criminal background check, along with any other state-specific requirements. Sholley Decl. ¶ 6 [#132]. Drivers submit their driver's license, social security number, and vehicle insurance information which Lyft then checks. Tucker Decl. ¶ 18(iii) n.21 [#133]. Lyft runs periodic background checks on drivers and will deactivate drivers with disqualifying criminal convictions. Id.

Once Lyft activates drivers, they can accept rides. However, drivers may not accept street hails, charge additional amounts for rides, or allow passengers to pay in cash or through a credit card reader. Terms §§ 4, 10(e) [#18-1]. Lyft tracks a driver's location when the App is on and, if given permission, when the App is off. Id. at § 2(B).

Lyft states that it "generate[s] substantially all of [its] revenue from [its] ridesharing marketplace that connects drivers and riders." Tucker Decl. ¶ 33 n.39 [#133] (quoting Lyft Form S-1 Registration Statement (March 1, 2019)). The company unilaterally sets fares, and at times changes the pricing structure. Id. at ¶¶ 47-48 [#133]; 2019 Lyft and Uber Driver Survey 40 [#130-2] (stating that Lyft's president emailed drivers after fare cuts to explain why the company made cuts). The company also collects riders' fares, including both "variable fares" based on duration and distance of a ride, and "quoted fares" that are fixed by Lyft through the App. Terms § 4 [#18-1]. After the ride is complete, the rider pays Lyft through the App. Sholley Decl. ¶ 5

11

[#132]; Tucker Decl. ¶ 18(iv) n.24 [#133]. Lyft retains a portion of these fares, designating these amounts as fees and commissions, charging "service fees" for each ride, and "prime time" fees for rides at peak hours. Terms § 4 [#18-1]; Tucker Decl. ¶ 33 [#133]. Lyft does not pay drivers instantaneously when Lyft is paid by the rider unless the driver accepts a "Lyft Direct" debit card and an associated bank account. Tucker Decl. ¶ 18(iv) n.25 [#133].

Between October 2018 and October 2019, approximately 57,000 drivers drove for Lyft in Massachusetts, providing rides to over two million passengers. Sholley Decl. ¶ 11 [#132]. Lyft drivers made, on average nationwide in 2019, $17.49 per hour before expenses, and $11.55 per hour after expenses. 2019 Lyft and Uber Driver Survey 6 [#130-2]. Drivers may drive as much or as little as they want on their own schedule and may reject ride requests. Tucker Decl. ¶ 22 [#133]. However, Lyft retains the right to deactivate drivers who violate the Terms or who fall below Lyft's "star rating or cancellation threshold." Terms § 16 [#18-1]. According to Defendants' random sample of Massachusetts drivers, 59% of drivers work less than 90 hours annually and only 2.6% of drivers drive over 30 hours per week. Crandall Decl. ¶¶ 12, 18 [#134]. To meet demand – and to incentivize drivers to drive more -- Lyft offers bonuses for drivers who work in "Personal Power Zones," where demand is high, and uses other bonus mechanisms. Tucker Decl. ¶ 28 [#133]; 2019 Lyft and Uber Driver Survey 4 [#130-2].

Lyft considers its drivers to be "independent contractors," and does not provide them sick leave benefits. Terms § 19 [#18-1]; Woodley Decl. ¶ 11 [#138].

The COVID-19 pandemic has affected Lyft's operations. The company has stated that no one should use ridesharing if they suspect they have or may have COVID-19, reminded drivers and riders of hygiene practices, provided hand sanitizer and cleaning wipes to drivers, suspended its "Shared rides" option which allowed riders to share a ride with other riders, and publicly

stated that if Lyft is notified of a driver or rider who tests positive, the individual will not be permitted to use the Lyft App until medically cleared. Westbrock Decl. ¶¶ 5-6 [#131]. The company does not provide paid time off for drivers who do not want to drive during the pandemic but has told drivers that Lyft has developed a fund to support drivers who test positive for COVID-19. Moyer Decl. ¶ 11 [#136].

As a result of the danger posed by the disease, some drivers have chosen to stop driving entirely. See Prunier Decl. ¶ 7 [#137]. Two of the Plaintiffs report that they felt sick after picking up riders who had attended a Biogen conference in Boston, where a number of people were infected with coronavirus, and after picking up riders at the airport. El Koussa Decl. ¶¶ 5-6 [#90-1]; Leonidas Decl. ¶ 6 [#90-2]. Both drivers continued to drive despite feeling sick because they needed income to pay their living expenses. El Koussa Decl. ¶ 7 [#90-1]; Leonidas Decl. ¶¶ 7-8 [#90-2]. Both drivers also feared being deactivated if they cancelled too many rides. El Koussa Decl. ¶ 6 [#90-1]; Leonidas Decl. ¶ 7 [#90-2].

Drivers report much lower demand for rides during the pandemic. Moyer Decl. ¶ 9 [#136]; Leonidas Decl. ¶ 11 [#90-2].

2. Massachusetts Earned Sick Time Law

Under the Massachusetts Earned Sick Time Law, M.G.L. c. 149, § 148C, employers with eleven or more workers must provide paid sick time to employees.[5] Employees earn sick leave at a rate of one hour for every thirty hours worked and may earn up to forty hours of leave per year,

---

[5] Section 148C(a) defines an "employee" as "any person who performs services for an employer for wage, remuneration, or other compensation . . . ." and an employer as "any individual, corporation, partnership or other private or public entity, including any agent thereof, who engages the services of an employee for wages, remuneration or other compensation." As discussed below, M.G.L. c. 149, § 148B (the "Independent Contractor Law") provides a further definition of who is considered an employee for the purposes of Chapter 149, including § 148C.

but may not use their leave until after 90 days of employment. Id. at §§ 148C(d)(1, 4). Sick time is paid at the employee's regular rate of pay. M.G.L. c. 149, § 148C(a). An employee may use sick time to 1) care for a child, spouse, parent, or parent of a spouse, who is suffering from a physical or mental illness or other qualifying medical issue; 2) care for their own physical or mental illness or qualifying medical issue; 3) attend a medical appointment for themselves or their child, spouse, parent, or parent of a spouse, or 4) address the health effects of domestic violence. Id. at § 148C(c). Part-time, seasonal, and temporary employees all qualify to earn sick time under the statute. 940 CMR § 33.02. Employers are required to keep accurate records of employees' accrual and use of earned sick time, and the Attorney General may inspect those records to ensure compliance. 940 CMR §§ 33.09(1, 2).

### 3. Federal Legislation Relating to COVID-19 Pandemic

In response to COVID-19, Congress has passed two statutes with provisions intended to provide economic relief to workers during the pandemic. Under the Families First Coronavirus Response Act ("FFCRA"), eligible self-employed individuals may receive tax credits in an amount equal to the individual's "qualified sick leave equivalent amount." Pub. L. No. 116-127, § 7002(a), 134 Stat. 178, 212 (2020). An eligible self-employed individual is defined as an individual who "regularly carries on any trade or business within the meaning of section 1402" of the Internal Revenue Code of 1986, and "would be entitled to receive paid leave during the taxable year pursuant to the Emergency Paid Sick Leave Act if the individual were an employee of an employer (other than himself or herself)." Id. at § 7002(b), 134 Stat. at 212. The qualified sick leave equivalent amount equals the number of days during the taxable year that the individual is unable to perform services (up to a maximum of ten days), multiplied by the lesser of $511 or 100% of regular pay if the individual is unable to work because he or she is subject to

a quarantine or isolation order, has been advised to self-quarantine, or is experiencing COVID-19 symptoms and is seeking a medical diagnosis, or by the lesser of $200 or 67% of regular pay if the individual is unable to work in order to care for an individual for a covered reason. Id. at § 7002(c)(1), 134 Stat. 212-13. In addition, the Act makes family leave tax credits equivalent to up to 50 days of leave available to self-employed workers. Id. at § 7004(c)(1)(A), 134 Stat. at 217. The FFCRA sunsets on December 31, 2020. Id. § 5108, 134 Stat. at 198.

The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") also provides economic assistance to self-employed workers. Pub. L. No. 116-136, 134 Stat. 281 (2020). The statute created the Federal Pandemic Unemployment Assistance ("PUA") program, which provides unemployment assistance through state agencies to "individual[s] who . . .[are] not eligible for regular [unemployment] compensation or extended benefits." Id. at § 2102(a)(3)(A)(i), 134 Stat. at 313. To receive benefits, individuals must self-certify they are capable of working, but are unable to work because, among other reasons, 1) they or a family member have been diagnosed with COVID-19; 2) they are under a quarantine order; 3) the individual has quit their job due to COVID-19; or 4) their place of employment is closed due to COVID-19. Id. at §§ 2102(a)(3)(A)(ii)(I, II), 134 Stat. at 313-14. Once approved, workers may receive up to 39 weeks of benefits for weeks of unemployment between January 27, 2020, and December 31, 2020. Id. at § 2102(c)(2), 134 Stat. at 315. In addition, the Act allows self-employed workers to apply for Paycheck Protection Program loans. Id. at § 1102(a)(2), 134 Stat. at 286-293.

Massachusetts has now set up the PUA program for self-employed workers in the state. See Pandemic Unemployment Assistance Benefits Brochure [#158-4]. In addition to the reasons listed in the CARES Act for eligibility, a self-employed worker qualifies under the program for

benefits if he or she "works as an independent contractor and the COVID-19 public health emergency has severely limited his or her ability to continue performing his or her usual work activities, and has thereby forced the individual to stop performing those activities." Id. at 4. PUA recipients receive a weekly benefit based on prior income for up to 39 weeks, as well as an additional $600 per week between April 4, 2020, and July 25, 2020. Id. at 1-5. Workers who continue to work part-time but have had their hours reduced because of COVID-19 are still eligible and, if approved, receive a prorated amount of unemployment assistance. Id. at 5.

B.  Standard

A preliminary injunction is an "extraordinary remedy never awarded as of right," Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008), appropriate where a plaintiff demonstrates that he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. In determining whether a plaintiff has made a showing of entitlement to relief, the court considers evidence if, "weighing all the attendant factors, including the need for expedition," the evidence proffered is "appropriate given the character and objectives of the injunctive proceeding." Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).

C.  Likelihood of Success on the Merits

The framework for determining whether a worker is an employee or an independent contractor under Chapter 149 begins with the presumption that an individual "performing any service" is an employee. Depianti v. Jan-Pro Franchising Int'l., Inc., 465 Mass. 607, 621 (2013) (quoting M.G.L. c. 149, § 148B ("§ 148B" or the "Independent Contractor Law")). The Independent Contractor Law provides that, except as authorized under Chapter 149:

an individual performing any service . . . shall be considered to be an employee under [Chapters 149 and 151], unless:

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149, § 148B(a). All three criteria "must be established to rebut the presumption of employment." Depianti, 465 Mass. at 621.[6]

In arguing that Lyft drivers are misclassified as independent contractors, Plaintiffs focus on the second prong of § 148B which requires Lyft to show "the service is performed outside the usual course of the business of the employer." Pls' Mot. 10-13 [#90]; id. at 5 (incorporating by reference prior briefing); Pls' Mot. and Mem. for Injunctive Relief 12-14 [#4]. This prong of the Independent Contractor Law differs from the traditional test used for purposes of unemployment insurance in Massachusetts. M.G.L. c. 151A, § 2, allows the employer to prove the second prong of the test to determine if a worker is an independent contractor in connection with unemployment insurance by showing that the worker's service "is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed." (emphasis added); see Athol Daily News v. Bd. of Rev. of the Div. of Emp't and Training, 439 Mass. 171, 178 (2003) ("the second part of the [unemployment insurance] test involves two separate criteria, and, if the

---

[6] The statute provides further that "the failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers compensation premiums with respect to an individual's wages shall not be considered in making a determination under this section." M.G.L. c. 149, § 148B(b).

employer demonstrates either, part (b) will be met"). The Independent Contractor Law eliminates the "outside of all the places of business" option for purposes of minimum wage, overtime and sick time, requiring the business to prove that the service is performed "outside the usual course of the business of the employer."[7]

Determining whether the services provided are outside the employer's usual course of business for the purposes of the Independent Contractor Law includes two different inquiries – establishing what services are performed by the worker, and establishing the "usual course of business of the employer." The court starts with the latter. The Independent Contractor Law does not define "the usual course of the business of the employer" and the issue has come up differently in the case law. In some cases, the employer did not dispute how the worker defined the employer's usual course of business but disputed liability for other reasons. See e.g., Athol Daily News, 439 Mass. at 178 (agreeing that employer "failed" the "usual course of the employer's business" part of the unemployment insurance classification test "in light of the fact that the [employer] itself defines its business as 'publishing and distributing' a daily newspaper," but considering alternative criteria under the unemployment statute). In other cases, workers

---

[7] The difference between the two tests means that a worker in Massachusetts can be classified as an employee under the Independent Contractor Law and therefore entitled to minimum wage, overtime and sick time under state law at the same time that the worker is not considered an employee under other state statutes. Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 328 (2015) (explaining that a taxi driver can be considered an employee under Wage Act while not considered an employee under workers' compensation statute); Subcontracting Concepts, Inc. v. Comm'r of the Div. of Unemployment Assistance, 86 Mass. App. Ct. 644, 647 (2014) (applying the classification test contained in M.G.L. c. 151A, § 2, which allows an employer to defeat an independent contractor presumption for purposes of unemployment assistance where worker performed his work "outside of all the [enterprise's] places of business"). That each statutory scheme provides its own requirements as to whether a worker is covered as an employee under the particular statute undermines Lyft's contention that awarding drivers earned sick time under M.G.L. c. 149, § 148C could have a detrimental effect on the drivers' ability to access new federal and state benefits.

have sought to hold the employer to its own definition of its business, but the employer protests

the applicability of its own prior characterization. In <u>Sebago v. Boston Cab Dispatch, Inc.</u>, for

example, the Supreme Judicial Court ("SJC") acknowledged that it has "recognized that a

purported employer's own definition of its business is indicative of the usual course of that

business." 471 Mass. 321, 327 (2015) (citing <u>Athol Daily News</u>, 439 Mass. at 179). It noted

further that the radio association businesses in <u>Sebago</u>, "advertise[d] themselves as providing

taxicab services and that they arrange[d] for the transportation of passengers." <u>Id.</u> Nonetheless,

the SJC held that, as "helpful as they are to the plaintiffs' cause," those facts "d[id] not override

the realities of the radio association's actual business operations." <u>Id</u>. The court finds that these

cases stand for the proposition that where the employer disputes the worker's characterization of

its usual course of business, the court must determine the reality of Defendants' "actual business

operations." <u>Sebago</u>, 471 Mass. at 327.

Lyft argues that its core business is as a "platform service," connecting drivers and riders.

In its Terms, Lyft states that it "does not provide transportation services and Lyft is not a

transportation carrier." Terms § 12 [#18-1]. Lyft also offers evidence that it files revenue reports

with the Securities and Exchange Commission (SEC) as a platform, not a transportation

company, and suggests this should be "persuasive evidence of the nature of its business" because

of potential liability for misstatements to the SEC. Defs' Opp'n 28 [#129] (stating Lyft files as a

"platform" and only reports as revenue fees paid to Lyft under rule ASC 606-10-55-38, as

opposed to reporting revenue from "the full price of the rides with the payments to drivers

considered costs" under rule ASC 606-55-37B). Lyft additionally relies on an expert report that

likens the company to other "placement services," such as those providing health care workers or

babysitters to other employers, and states that Lyft's business should be viewed as an improvement to a "taxi stand, rather than as a taxi company." Tucker Decl. ¶ 16 [#133].

At the same time, Lyft holds itself out to the public as a transportation company. For example, in their National Impact Report for 2020 discussing benefits of using Lyft instead of private vehicles for transportation, the company highlights time and travel cost savings as a result of Lyft and promotes how many vehicles consumers have stopped using because of the availability of Lyft. 2020 National Impact Report 6, 8 [#130-1]. Lyft further acknowledges that it "generate[s] substantially all of [its] revenue from [its] ridesharing marketplace that connects drivers and riders," Tucker Decl. ¶ 33 n.39 [#133] (quoting Lyft Form S-1 Registration Statement (March 1, 2019)), and that it controls many of the central aspects of rides provided by its drivers, from performing background checks on drivers and continuously tracking their actions to setting the price of rides and restricting methods of payment.

"A business cannot alter the substance of its usual course of business merely by careful (or careless) self-labeling in its dealings with contractors, employees, customers, or the public." Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 806 n.9 (2018). Nor may it "create[e] a false dichotomy between the administrative and operational aspects of their business." Sebago, 471 Mass. at 330 (contrasting with Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 14, 21 n.4 (1st Cir. 2014)).

Based on the record in front of the court, the court finds a substantial likelihood of success on the merits that, despite Lyft's careful self-labeling, the realities of Lyft's business – where riders pay Lyft for rides – encompasses the transportation of riders. The "realities" of Lyft's business are no more merely "connecting" riders and drivers than a grocery store's business is merely connecting shoppers and food producers, or a car repair shop's business is

merely connecting car owners and mechanics. Instead, focusing on the reality of what the business offers its customers, the business of a grocery stores is selling groceries, the business of a car repair shop is repairing cars, and Lyft's business – from which it derives its revenue – is transporting riders.

The court turns next to considering what services are performed by the drivers, and "whether the service the individual is performing is necessary to the business of the employing unit or merely incidental." Sebago, 471 Mass. at 333 (quoting in part Advisory 2008/1, Attorney General's Fair Labor and Business Division). Lyft argues drivers do not provide services to Lyft but rather receive a service from Lyft by "using Lyft's service to provide transportation services to riders." Defs' Opp'n 24 [#129]. Moreover, Lyft argues, based on its contention that its business is only "connecting" riders and drivers, that "drivers perform[] work that is outside the usual course of Lyft's business." Id. at 26 (quoting in part M.G.L. c. 149, §148B(a)(2)). But Lyft ignores that the drivers are "provid[ing] transportation services to riders," and that service, as detailed above, is the service for which Lyft is being paid by riders.

Defendants argue further that Lyft has "'legitimately defined the boundaries of its operations, and outsourced functions it considers to be beyond those boundaries to 'separately defined' businesses or third parties, [and] the independent contractor statute cannot be used to 'expand those boundaries.'" Id. at 27 (quoting Ruggiero v. Am. United Life Ins. Co., 137 F. Supp. 3d 104, 119 (D. Mass. 2015)). Ruggiero does not support Defendants' argument based on the facts here. There, the district court discerned two categories of Massachusetts cases challenging a worker's classification. First, "there are cases in which the defendants equip the plaintiffs with the tools, resources, and opportunity to sell or provide the defendants' products, often earning a commission or percentage of the sales, and essentially franchising their

business." 137 F. Supp. 3d at 119.[8] Second, there are cases "in which the defendants merely give

the plaintiffs a license or a product and leave the plaintiffs to their own devices to make a profit

from it." Id.[9]

The court finds a substantial likelihood that on the merits this case will fall in the first

category, where Lyft equips drivers with tools to provide Lyft's ridesharing services to riders and

Lyft earns a percentage of proceeds from those rides, and thus for purposes of the Independent

Contractor Law, the drivers will be considered employees. Despite Lyft's contention that it

receives no services from drivers, its own pricing model and structured relationship with drivers

shows Lyft to be directly dependent on the drivers' services. Lyft sets riders' fares and collects

---

[8] See id. (citing Martins v. 3PD, Inc., 2013 WL 1320454, at *14 (D. Mass. Mar. 28, 2013) (delivery company held itself out publicly as a delivery company and contracted directly with customers to provide services; plaintiffs performed "a vital and necessary aspect of its business" by providing "the delivery services that, both internally and publicly, appear to form the foundation of its business"); Awuah v. Coverall N. A.,, Inc., 707 F. Supp. 2d 80, 82, 84 (D. Mass. 2010) (rejecting argument that franchising is in itself a business, and concluding that cleaning franchisor engaged in same business of commercial cleaning as cleaners themselves); DeGiovanni v. Jani-King Int'l, Inc., Civ. Act. No. 07–10066–MLW, hearing tr. at 81 (D. Mass. June 6, 2012) (commercial cleaning company engaged in same business as janitorial workers because company held itself out as a leader in commercial cleaning, and contracted directly with customers to provide cleaning services); Oliveira v. Advanced Delivery Sys., Inc.,, 27 Mass. L. Rptr. 402, at *6 (Mass. Super. Ct. July 16, 2010) (defendant in business of providing home furniture delivery management services to furniture retailers in same business as individuals who make furniture deliveries); Chaves v. King Arthur's Lounge, Civ. Action No. 07–2505, slip op. at 7 (Mass. Super. Ct. Aug. 7, 2009) (exotic dancer worked in course of business of adult entertainment lounge); and Rainbow Dev., LLC v. Dep't of Indus. Accidents, 2005 WL 3543770, at *3 (Mass. Super. Ct. Nov. 17, 2005) (individuals who provide detailing and conditioning services for cars were engaged in same business as defendant that administered and coordinated these services; "[w]ithout the services of the workers, [defendant] would cease to operate")).

[9] See id. (citing Sebago, 471 Mass. at 334 ("the medallion owners' leasing business is not directly dependent on the success of the drivers' endeavors" because owners "are not concerned with the results of the plaintiffs' operations, as drivers are not required to remit a percentage of their revenues, which include both fares and tips"; drivers only contribute "incidentally" to owners' advertising revenues); and Kubinec v. Top Cab Dispatch, Inc., No. SUCV 201203082BLS1, 2014 WL 3817016, at *10–13 (Mass. Super. Ct. June 25, 2014) (finding defendant taxi dispatch service not in same business as taxi drivers)).

fees and commissions on each ride. Terms at ¶ 4 [#18-1]; 2019 Lyft and Uber Driver Survey 21, 25 [#130-2] (stating that Lyft sets drivers' pay based on mileage and duration). As a result, Lyft's revenue is directly contingent on how much drivers drive. See Sebago, 471 Mass. at 334 (distinguishing between taxicab leasing companies, who received a flat-rate payment for leasing cabs and medallions, and companies that receive a percentage of drivers' earnings). Drivers also are clearly not incidental to Lyft's business and Lyft does not argue that it could continue as a company without drivers. See Tucker Decl. ¶ 33 n.39 [#133]; see also Ruggiero, 137 F. Supp. 3d at 119 (stating, in finding that insurance sales agents were not acting in the regular course of the insurance company's business, that the putative employer "could still produce insurance products without [sales agents]."). Thus, applying the Independent Contractor Law would not "expand the boundaries" of Lyft's business, but merely ensure that Massachusetts wage, overtime and sick time law applies to the drivers who perform the service that Lyft's business provides to riders.

Taken together, Plaintiffs have a substantial likelihood of success on the merits of their misclassification claim.

D.   Balance of Equities Favor Plaintiffs

Defendants argue that classifying drivers as employees under the Independent Contractor Law would "significantly disrupt Lyft's operations," would require it to "overhaul its business" and "redesign how it operates in the Commonwealth," and that the employment model "would destroy … [the] flexibility and independence" for drivers who remain with Lyft. Defs' Opp'n 3, 21, 28 [#129]. Lyft asserts that if it used an employment model, it "would . . . use tens of thousands of fewer drivers, [who would] work[] closer to full time, in a rigid set of shifts at the time and places with sufficient demand." Id. at 20. Defendants argue further that "flexibility and

independence . . .has defined ridesharing" id., and this is a flexibility that "no employee[] could possibly expect." Id. at 27 (citing Tucker Decl. ¶¶ 18-36 [#133]).

This argument is a red herring. Nothing in the relief sought by Plaintiffs would interfere with drivers' flexible schedules. Absent a collective bargaining agreement, employers may choose to schedule employees on a fixed schedule, may require them to be "on-call" and to report to work on the employer's demand, or may allow them to set their own schedule. A determination that drivers are employees under the Independent Contractor Law for purposes of the paid sick time benefits sought by Plaintiffs would require Lyft to provide limited sick time. The Independent Contractor Law does not require fixed schedules and Defendants have pointed to no other legal requirement mandating fixed schedules. The threatened harm claimed by Defendants is illusory.

As the court has found that Plaintiffs have a substantial likelihood of success on the merits of their classification claim, and as Lyft has come forward with no meaningful harm from providing the requested sick leave benefits, the balance of the equities favor Plaintiffs.

E.  Public Interest

The amicus curiae brief from the Attorney General highlights the strong public interest both in the proper classification of workers and in workers' access to paid sick time. Amicus Curiae Br. of the Mass. Attorney General ("Mass. AG Brief") [#103]. The Attorney General notes that "misclassification remains particularly prevalent throughout the transportation sector," contributing to the improper denial of access to sick time and other benefits. Id. at 2, 6. Misclassification "not only hurts the individual employee; it also imposes significant financial burdens on the Federal government and the Commonwealth in lost tax and insurance revenues" and "gives an employer who misclassifies employees as independent contractors an unfair

competitive advantage over employers who correctly classify their employees and bear the concomitant financial burden." Somers v. Converged Access, Inc., 454 Mass. 582, 592 (2009). When workers are misclassified, taxpayers bear the burden.

In addition, during the ongoing COVID-19 pandemic, Lyft drivers provide an "essential service" according to Massachusetts and yet "ride-sharing drivers who provide these essential services do not have basic protections and benefits" necessary to protect themselves and the public. Mass. AG Brief 5 [#103]. This is despite the Attorney General's encouragement of employers to "allow employees liberal access to all forms of paid leave to facilitate compliance with governmental public health recommendations." Id. at 8. Without access to sick leave, staying home "is far easier said than done" and it is more difficult for workers to receive needed medical care for themselves or for their family members and more difficult to protect the public from the spread of disease. Id. at 7-11.

F. Irreparable Injury

Finally, the court considers whether Plaintiffs face irreparable harm if they are not immediately reclassified so they may receive sick pay under the Massachusetts earned sick time law. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) (stating that irreparable harm is an "essential prerequisite" for receiving injunctive relief).

Plaintiffs assert they face irreparable injury due to Lyft denying drivers state-mandated paid sick time. Pl's Mot. at 4 [#90].

Defendants respond first that sick leave only has two purposes: to give workers job security when staying home due to illness and to provide income for missed work. Defs' Opp'n 13 [#129]. Defendants point out that Plaintiffs' job security is not an issue, as Plaintiffs may choose when to work and not work, without penalty. Id. They are also correct that, to the extent

that Plaintiffs seek the monetary value of unpaid sick time benefits (past and future), Plaintiffs'
complaint amounts only to a claim for monetary damages, which, generally, is not sufficient to
show irreparable harm. See Levesque v. Maine, 587 F.2d 78, 81 (1st Cir. 1978) ("possible loss of
earnings is not the type of injury which warrants a finding of irreparable injury").

Plaintiffs point to a different harm – that drivers will "contract[] and infect[] passengers
with the coronavirus and contribut[e] to the spread of the disease to the general public." Pls'
Mot. 4 [#90]. They state that "Plaintiffs and other Lyft drivers will not only be unable to protect
their own health, but also unable to protect the health of Lyft passengers and the general public"
because they will need to keep working to afford basic necessities. Id. at 15-16. Plaintiffs assert
that the failure to provide sick leave "is now, indisputably, endangering Lyft drivers, Lyft
passengers, and the general public." Id. at 4.

To the extent that Plaintiffs are arguing that their own health is endangered by driving
when sick, the court cannot find that Defendants are the legal cause of any such harm. Lyft has
not threatened to terminate drivers if they do not drive, and to the contrary, has instructed drivers
not to drive if they are sick. While Plaintiffs are objecting that Defendants' failure to pay sick
leave is resulting in drivers deciding to drive while sick, Plaintiffs cannot establish that
Defendants "caused" Plaintiffs to make that decision. Plaintiffs also have offered no evidence
that driving while sick will endanger Plaintiffs' own health.

As to the health of Lyft passengers and the general public, the court agrees that a further
purpose of sick time is to help decrease the spread of disease, and that if drivers drive while sick,
they may well be spreading disease. This potential harm to the public, however, is not the same
as harm to Plaintiffs themselves. And while Lyft's determination to fight payment of sick leave
benefits may prove short-sighted if riders fear that Lyft drivers are driving while sick because

they cannot afford to be home without sick time, the court does not find that interference with this purpose amounts to an irreparable injury to Plaintiffs themselves.[10]

Defendants point out further that the federal government's emergency assistance programs have been made available to employees and independent contractors alike. Under FFCRA, self-employed workers are eligible for tax credits for paid sick leave and for family leave. Pub. L. No. 116-127, §§ 7002(c)(1)(B), 7003(a), 134 Stat. 178, 212 (2020). The new PUA program also allows self-employed workers to apply for unemployment insurance if they are unable to work or have had their hours reduced because of COVID-19. CARES Act, Pub. L. No. 116-136, §§ 2102(a)(3), (c)(2), 134 Stat. 281, 313–15 (2020). Under that program, drivers may receive up to 39 weeks of benefits. Id.[11]

Plaintiffs respond that the award of immediate paid sick leave through an injunction is essential while the federal programs are still in flux and because the federal programs require drivers to navigate complicated application processes. Pls' Reply at 2-3 [#144]; Kramer Decl. ¶¶ 6-9 [#144-3]; Fuentes Decl. ¶¶ 8-9 [#144-4]. Plaintiffs also point out that any such benefits would be in addition to the sick leave due under Massachusetts law. Pls' Reply at 2-3 [#144]. The court agrees that these federal benefits do not negate Plaintiffs' claim to sick leave benefits. But as Plaintiffs have not shown that the unavailability of paid sick leave amounts to irreparable

---

[10] Plaintiffs, joined by the Massachusetts Attorney General, also ask the court to find irreparable harm based on considerations of harm to the public. Pls' Mot. at 7 n.16 [#90]; Amicus Curiae Br. of Mass. Attorney General at 9-11 [#103]. The court previously rejected this argument, Mem. and Order [#88], and declines to reconsider this issue in light of the pending appeal of that order. See Notice of Appeal [#119].

[11] Massachusetts began accepting unemployment insurance applications from Lyft drivers and other gig-economy workers on April 20, 2020. See Baker-Polito Administration Announces Implementation of CARES Act Unemployment Benefits for Self-Employed, Gig-Economy, and Other Workers (April 20, 2020) [#158-1].

harm to the drivers, neither the availability of alternative assistance provided by the federal government nor the difficulty in obtaining such assistance affects the calculus here.

Finally, Plaintiffs argue that "the overwhelming strength of Plaintiffs' showing on the other prongs" allows for a weaker showing on the irreparable harm prong. Pls' Mot. 7, n.16 [#90] (citing Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) for the proposition that irreparable harm should be measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the show necessary on irreparable harm depends in part on the degree of likelihood of success shown." (internal citations omitted)). But even applying a sliding scale, Plaintiffs are not entitled to preliminary injunctive relief where they have not shown irreparable harm.

Accordingly, as Plaintiffs have failed to show irreparable harm, Plaintiffs' Emergency Motion for a Preliminary Injunction [#90] is DENIED.[12]

IV.    Conclusion

For the above reasons, Defendants' Emergency Motion to Confirm Stay Pending Appeal [#107] of the entire case is GRANTED as to Defendants' obligation to answer Plaintiffs' Third Amended Complaint [#147] and as to discovery, and otherwise is DENIED, and Plaintiffs' Emergency Motion for a Preliminary Injunction [#90] is DENIED.

IT IS SO ORDERED.

Date:  May 22, 2020                                    /s/ Indira Talwani
                                                       United States District Judge

---

[12] Defendants object to the award of a preliminary injunction for all Massachusetts Lyft drivers as a class has not yet been certified. As the court finds that Plaintiffs have not shown irreparable harm, to themselves or to the putative class, the court need not reach this issue.